# UNITED STATES DISTRICT COURT

RECEIVED
BY MAIL

## DISTRICT OF MINNESOTA

JAN 0 7 2021

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

| | |
|---|---|
| Kenneth Daywitt,  Russell Hatton,  Steven Hogy, Merlin Adolphson, Michael Whipple, Peter Lonergan, and others similarly situated<br><br>Plaintiffs<br><br><br>v.<br><br><br>Jodi Harpestead DHS Commissioner, Marshall Smith, Nancy Johnston,  Jim Berg, and Jannine Hebert, Kevin Moser, Terry Kniesel, and Ray  Ruotsalainen  in their individual and official capacities<br><br><br>Defendants | Court File No.  20-cv-1763 (NEB/KMM)<br><br><br><br>**First Amended Complaint Pursuant to 42 U.S.C.  1983, 1985,  and 1988.** |

# **INTRODUCTION**

1.  Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan bring suit against Defendants for personal injury claims including their right to communicate, interact and otherwise obtain information which in turn create First Amendment and Fourteenth Amendment Substantive Due Process violations.   Defendants impose significant unnecessary hardships on citizens who are confined within the Minnesota Sex Offender

SCANNED
JAN 0 7 2021
U.S. DISTRICT COURT MPLS

Program (MSOP) through restrictions of any access to modern technologies[1] causing an inability to stay informed with current affairs and times including political campaigns, educational opportunities, family and support communications etc.  by the complete restriction of access to the internet and denying patients the right to possess their own technology devices.   These restrictions are absolute for any access to Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan 's family, friends, and support peers through email, Skype, Zoom, or other interactive mediums which allow Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan to have access to family and support, religious, educational, political, or vocational opportunities.

2.    Additionally, Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  are being denied the right to access sites which would allow Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  the ability to stream religious activities freely that would adhere to their spiritual needs, educational programs to further their education and learn new subjects, participate in the U.S.  District Court Pacer, ECF program or the Minnesota State District Court equivalent,  and access the courts with up-to-date legal research programs ( i.e.  Westlaw, Lexis Nexis), and gain access to information about candidates who are running for elected offices, their views on a variety of subjects, and to shop for essential items including but not limited to, clothing, electronic items, paper products, etc.    Defendants currently own software installed on network secure firewalls so

---

[1] Modern technologies herein are defined as but not limited to: cellphones, computers, laptops, internet, iPads, tablets, other personal communication devices, etc…

inappropriate materials are not being accessed by staff.   This same software could be adapted for Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan as well.

# PROCEDURAL BACKGROUND

3.  Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  are currently civilly committed citizens in  the Minnesota Sex Offender Program ("MSOP) at Moose Lake, MN pursuant to the Minnesota Commitment and Treatment Act and Minn.  Stat.  § 253B.

# NATURE OF ACTION

4.  Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  bring this action on behalf of themselves alleging violations of their constitutional, statutory and common law rights.    Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  allege MSOP Policies #120-5600 Client Computer Network, #420-5107 Video Visiting and #420-5035 Client C-Mail, are all unconstitutional, because the nature of the policies are to segregate and create censorship on citizens that are civilly committed within the state of Minnesota. Additionally, this prohibition forfeits Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  opportunity to acquire information on the candidates running for state and federal offices and their position for intellectual voting.   Specifically, Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  allege the Defendants, have each in their individual capacities as well as their official capacities, have, among other things:

    a) Failed to provide policies and conditions that are reasonably related and narrowly tailored to the purpose for each Plaintiff related to communication and technology

and the First Amendment to the United States Constitution and Minnesota Constitution;

b) Stymied Significant Relationships; and,

c) Denied Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan the right to be substantive due process in violation of clearly established rights under the Fourteenth Amendment to the United States Constitution and Minnesota Constitution;

5. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan seek injunctive and declaratory relief for these constitutional, statutory, and common law violations on their behalf.

6. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan further request that MSOP Policies 120-5600 Client Computer Network, 420-5107 Video Visiting and 420-5035 and Client C-Mail, be found to be unconstitutional as applied and on its face.

7. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan also request compensatory damages be awarded in this case as a deterrent from further violations.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1331. This Court has supplemental jurisdiction for Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the acts and omissions giving rise to these claims occurred in the State of Minnesota and all Defendants actions were committed within the State of Minnesota.

## DECLARATORY AND INJUNCTIVE RELIEF

9.   This Court has authority to grant declaratory relief pursuant to 28 U.S.C.  § 2201 as an actual controversy exists regarding the rights privileges, and immunities to which Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  are entitled to while committed and hospitalized to the care and custody of the Defendants.  Pursuant to  28 U.S.C.  § 2202, this Court has authority to grant injunctive and other necessary and proper relief.

## PARTIES

**Plaintiffs**

10. Kenneth Daywitt is a patient who resides within the MSOP program at Moose Lake and has suffered discrimination by Defendants by denying him access to the internet and/or other technologies which include live streaming of Jewish Services, continued educational pursuits, as Daywitt holds a Doctorate in Religious Science from the Universal Life Church in Modesto, California,  intelligent voting as a registered voter within Carlton County since 2010, access to family and friends whom are healthy support, access to GLBTQ+ support, interacting with medical providers, ordering essential items,  amongst other things, so as a way to survive independently within the environment he is currently confined to.  Daywitt is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time.   He has been and continues to be injured by the Defendants.

5

11. Steven Hogy is a patient who resides within the MSOP program at Moose Lake and has suffered discrimination by Defendants for denying him access to the internet and/or other technologies, as a way to survive independently within the environment he is currently confined to. Defendants deny Hogy the ability to order his own items and must rely on support because their unnecessary restrictions on technologies. Hogy has been a registered voter in Carlton County since 2013. Additionally, Hogy was denied the right to have any type of visit with his mother before she passed away due to unnecessary restriction placed on him by defendants. Hogy had full access to the internet while on supervised release from the Department of Corrections, which was routinely checked by his parole agent without issue. Hogy is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the Defendants.

12. Merlin Adolphson is an aged patient who resides within the MSOP program at Moose Lake and has suffered discrimination by Defendants for denying him access to the internet and/or other technologies, as an elderly person, Adolphson is denied access to elderly care information due to unnecessary restrictions by Defendants. As an avid movie collector, Adolphson is unable to order or even check movies out to see if it is worth his attempting to buy due to policy restrictions on media and due to the unnecessary restrictions Defendants place upon him. Adolphson has never had any violations related to internet. Adolphson would utilize the internet and other technologies as a way to survive independently within the environment he is currently confined to.

6

Adolphson is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time.   He has been and continues to be injured by the Defendants.

13. Michael Whipple is a patient who resides within the MSOP program at Moose Lake and has suffered discrimination by Defendants for denying him access to the internet and/or other technologies, which include him not having interactive contact with his family, and other support who are not within this state, pursue interests to learn how to utilize a computer, further educational pursuits, continue to learn the Lakota language, and other things as a way to survive independently within the environment he is currently confined to.   Whipple is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time.   He has been and continues to be injured by the Defendants.

14. Peter Lonergan is a patient who resides within the MSOP program at Moose Lake and is suffering discrimination by Defendants for unnecessarily denying him access to the internet and/or other technologies.    Lonergan has never been convicted of or even suspected of criminal activities while using a computer, or the internet.   Lonergan had limited access to the internet while serving his prison sentence without issue. Additionally, Lonergan is trained and certified in many IT disciplines including but not limited to: software engineer; network engineer; software development; A++ Certification; software testing; webpage development; and other basic computer instruction for operating system and software applications.  Lonergan is also a registered

voter in Carlton county, and is being deprived from receiving information on political candidates and church online.  Lonergan is civilly committed to the MSOP in the care and custody of the Defendants for an indefinite period of time.   He has been and continues to be injured by the Defendants.

15. Russell Hatton is a patient who resides within the MSOP program at Moose Lake and is suffering discrimination by Defendants for unnecessarily denying him access to the internet and/or other technologies. Hatton has never been convicted of or even suspected of criminal activities involving computers or the internet.  Defendants denial of access to the internet or other modern technologies have stymied Hatton's relationship with his children as well as disabled him from being able to get information on candidates for intelligent voting. He is also unable to have interactive contact with his family some of whom do not live in the country. Hatton is civilly committed to the MSOP in the care and custody of the Defendants for an indefinite period of time.   He has been and continues to be injured by the Defendants.

**Defendants**

16. Jodi Harpestead is the DHS Commissioner and responsible for the overall operation of the Department.    MSOP is a sub-operation within and under the DHS umbrella. Therefore, Defendant Harpestead in her official capacity, implemented, retained and carried out polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

8

17. Nancy Johnston is the Executive Director of the MSOP whose duty it is to oversee the entire MSOP proper.   Defendant Johnston in her official capacity and individual capacity, implemented, retained and carried out polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

18. Marshall Smith is the Health Systems Chief Executive Officer for Direct Care and Treatment within the DHS and is responsible for overseeing policies for the Direct Care and Treatment facilities in which MSOP is one.   Defendant Smith in his official capacity as well as his individual, implemented, retained and carried out polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

19. Jim Berg is the Deputy Director of the MSOP whose duty it is to assist in the day to day operation of the MSOP proper.   Defendant Berg in his official and individual capacities, implemented, retained and carried out in polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

20. Janinne Hebert is the Executive Clinical Director in charge of the overall clinical leadership and operations of the MSOP proper.   Defendant Hebert in her official and individual capacities, implemented, retained and carried out in polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

21. Kevin Moser is the Facility Director of the MSOP Moose Lake his duties include directing the day to day operations of the facility.   Defendant Moser in his official and

individual capacities, implemented, retained and carried out in polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

22. Terry Kniesel is the Assistant Facility Director of MSOP Moose Lake, whose duty it is to assist the Facility Director in the day to day operations of the facility.  Defendant Kniesel in his official and individual capacities, implemented, retained and carried out in polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

23. Ray Ruotsalainen is the Moose Lake IT Lead in charge relaying information on network security and appropriate venues for patients to utilize or not.  Defendant Ruotsalainen in his official and individual capacities, implemented, retained and carried out in polices through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs.

## **FACTS**

24. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  have been civilly committed indeterminately for more than a decade each with one being committed for 27 yrs.

25. In the time that Adolphson has been committed to the Defendants care, patients were allowed to purchase and possess personal computer units within their rooms, Adolphson is the only Plaintiff who was civilly committed when they allowed patients to possess

10

their own personal computers.  These computers did not have internet access and were not on a network.

26. Prior to 2006, MSOP allowed patients such as Adolphson to possess their own computers, however, those computers did not have access to internet or other technology communications as the MSOP did not allow for anything greater than Microsoft Windows 98 with no modem or server the operating system had to be Window 98 or earlier.

27. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan are civilly committed as "sexually dangerous" people not "generally dangerous."  Therefore, the argument that they can be treated as second or third rate citizens does not apply.

28. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  fall into a class of people who are protected under Minn. Stat. § 144.651 Subd. 1 & 2.

29. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  all retain their civil rights completely, including the right to vote, education, religious freedom, and commerce.  All Plaintiffs are registered to vote within Carlton County.

30. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  currently have access to computers for the purpose of legal research on a preloaded system (Lexis Nexis), typing and creating word documents all of which are monitored by the current facility parameters for inappropriate use.

31. The internet has become an important and necessary tool for common survival in the world. For such purposes including but not limited to information related to political candidates, education, religion, courts, bird watching, surveying real estate, interacting with family and loved ones, attending virtual support groups, shopping and a plethora of other necessary and relevant information to ones survival in the world. Even this Court benefits from the Internet (i.e. Pacer). Should Pacer not exist, Courts would be forced to mail numerous documents to the parties involved taking more time and be less effective.

32. The internet is a part of everyday life in modern society. Allowing Plaintiffs internet access will help prepare them for life outside of the MSOP.

33. The internet is a pervasive part of everyday life outside of the secure perimeter of the MSOP.

34. The cyber age has become the new norm, Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan , however, are not afforded this right to progress with normal society due to the unnecessary restrictions placed on them through the aforementioned policies by these Defendants. Therefore making Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan socially and mentally retarded.

35. At one time hospitals did not even have things such as telephones, televisions, or other technologies that have since developed and been gradually implemented into use in these institutions.

36. Completely preventing Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan from accessing the internet unnecessarily isolates them from the society, because they are not able to pursue online educational opportunities, employment opportunities, spiritual pursuits, or even communicate with friends and family via email. Additionally, they are not able to keep up on information regarding political and judicial candidates who are running for elected offices both state and/or federally, access to the courts electronically to file and receive documents on their cases, amongst other things.

37. In the modern era, the internet is essential for public gatherings to celebrate some views, to protest others, or simply to learn and inquire. While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular.

38. The forces and directions of the Internet is so common, 25+ years old into its current maturity, which is continuing to grow daily to include firewalls and other technology, that courts must be conscious what they say today, might be obsolete tomorrow.

39. Social media allows users to gain access to information and communicate with one another about that information on any subject that might come to mind. Prohibiting civilly committed citizens from using social media websites bars access, to what for many in open society are, the principal sources for knowing current events, speaking and

listening in the modern public square, voting information, political campaigns, and otherwise exploring the vast realms of human thought and knowledge.

40. A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more.

41. Local newspapers, periodicals, magazines, and other reading mediums are even going to electronic versions only and will no longer be available in printed form sooner than later as the cost is less than to have e-subscriptions opposed to print. Currently, there is a northern Minnesota newspaper, the Duluth News Tribune, which will be going to online only service sometime before the end of 2020. The Rochester Post Bulletin went to 2 days a week printed and the rest of the days are on the internet.

42. *The Session Weekly* and *Senate Briefly* are both online only publications and cannot be found in any other format other than online, these publications are essential to citizens including Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  so as to get information on what is going in the Minnesota legislature. *Politics in Minnesota* is another example of an online only publication which is essential to Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  for informational purposes as the environment they live in is very political.

43. It is well established that, as a general rule, the government may not suppress lawful speech as the means to suppress unlawful speech.

14

44. The right to access information is an inherent corollary of the rights of free speech and press in two respects,  First, the right to receive ideas follows ineluctably from the sender's First Amendment right to send them.  Second, and more importantly, the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom.  Finally, Plaintiffs have a right to all of these interactions aforementioned *supra*, with such rights.

45. The forefathers of our United States Constitution undertook to secure conditions favorable to the pursuit of happiness.  They recognized the significance of man's spiritual nature, of his feelings and of his intellect.  They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things.  They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man.

46. Courts recognize adults have a constitutional right to receive information online and to address that free speech to one another which would assist in their pursuit of happiness, through enhancing their spiritual, intellectual, educational, and/or vocational needs.

47. Social media offers a relatively unlimited, low-cost capacity for communication of all kinds, and social media users employ various websites to engage a wide array of protected First Amendment activity on topics as diverse as human thought, religious

expression, or simply being a contributing interactive member in today's society including voting for elected officials and their campaign ideologies, a right that Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan all retain but are not afforded.

48. The MSOP policies implemented by Defendants enact a prohibition unprecedented in the scope of First Amendment speech it burdens to make Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan socially and mentally retarded.

49. Defendants currently own and employ software used for staff, which allow for staff to utilize the internet, depending upon their job location. Their interaction with patients, determines the level of access they have to the internet, MSOP Policy #120-5205 *Internet Access*. **All staff** are given level 3 status which permits them to access all sites except those in Department of Human Services (DHS) restricted categories, which would include pornography sites amongst others. These guidelines are all taken from the *Statewide Policy on the Appropriate Use of Electronic Communication and Technology*.

50. The Defendants maintain a list of approved level 2 websites, and adds and subtracts as they see necessary for staff. This could be available for patients as well to allow access to various websites which would be beneficial to Plaintiffs as well as clinical staff.

51. Defendants have placed Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan in a sub-citizen category making them third class citizens analogous to third world countries.

52. Defendants believe the hospital fences of the facility create a barrier which limits the constitutional protections of the First Amendment to Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan including but not limited the following identified for each Plaintiff:

53. Daywitt, a member of the Orthodox Jewish community, is stymied from fully participating in religious services and other religious activities, which could be possible if technologies were not unnecessarily restricted within the MSOP by Defendants.

54. Daywitt could participate in furthering his education if allowed access to the internet or other electronic mediums which would give him access to the college of his choice.

55. Daywitt, a member of the GLBTQ+ community could interact with the GLBTQ+ community he was a part of, to include being an advocate for GLBTQ+ rights, if he were granted internet and other modern technologies and not unnecessarily restricted from its use, by attending meetings virtually.

56. Additionally, Daywitt could set up and maintain appointments with medical professionals of his choice whom could treat and care for his various medical issues including but not limited to his psoriasis by competent dermatological staff who are not contracted with MSOP.

57. Daywitt has no direct access to the internet, or his own computer to complete the mundane tasks of everyday life. These would include shopping. Daywitt must instead

17

depend on his significant support system living in society to complete these domestic tasks for him.   Daywitt has purchased more than $5000.00 annually, over the internet; which may not seem like much.  But, when one takes the time to consider that a third-party must complete these tedious domestic tasks for him, this demonstrates how it could cause rifts between his extremely important supportive relationships in society and himself.

58. Daywitt's mother, who. is aged and not very computer savvy, is charged with assisting him to purchase those things of necessity.   If Defendants did not have unnecessary restrictions on these very simple mundane tasks, Daywitt, could accomplish these goals himself without the need to rely on his extremely important support in society.

59. Daywitt would additionally be able to have interpersonal contact with his family and support peers and other groups that could be beneficial to his continued rehabilitation, if allowed modern technologies unnecessarily restricted by Defendants.  This would include building healthy relationships with positive support who are involved in their own change processes.

60. Daywitt would benefit from video visits as his parents who are both aged travel from a distance of more than 5 hours away, however unnecessary restrictions on modern technologies have been placed on him by Defendants which deny video visiting from happening.

61. Daywitt a fairly litigious individual is stymied from filing and receiving filings from opposing counsel in a timely manner, or at all, due to being unnecessarily restricted from internet and other modern technologies.

62. If the current restrictions placed on Mr. Daywitt are unnecessary, it is counter therapeutic to the purpose for which he is committed, because maintaining healthy relationships in society are extremely important to successful treatment and reintegration, which Defendants' place into jeopardy by modern technology restrictions.

63. Whipple is not a Minnesota resident, he is an enrolled member of the Standing Rock Dakota Sioux Reservation.   Having modern technologies available would allow for him to access his reservation's website and have access to the Reservation's newsletter and participate in different community activities which all require modern technology.

64. Whipple is unnecessarily restricted from having personal contact with his mother who is aging.    His mother had a major surgery while Whipple has been confined at MSOP.   Numerous family members, whom he has not had contact with were present and he could have interacted with them if unnecessary restrictions were not in place. Additionally, Whipple is unnecessarily restricted from contact with his other siblings and children who are significant to his continued rehabilitation, having modern technologies would allow for Whipple to interact with his mother and other family members in a manner which is more than just a simple phone call.

65. Whipple, who is basically computer illiterate would benefit from allowing him the opportunity to learn computer skills and other modern technologies which in turn would prepare him for life outside of MSOP to be successful.

66. If the current restrictions placed on Mr. Whipple are unnecessary, it is counter therapeutic to the purpose for which he is committed, because maintaining healthy relationships in society are extremely important to successful treatment and reintegration, which Defendants' place into jeopardy by modern technology restrictions.

67. Lonergan is unnecessarily restricted from accessing the internet, which if allowed could make him a part of societies tax base instead of being a tax burden.   With Lonergan's skills and expertise in the IT field he could make $138,000 annually.   Even at an entry level, he could make $48,000 annually.  If this unnecessary restriction was not in place, Lonergan would not need to rely on the government to provide him with welfare assistance.

68. Lonergan could attend college and continue to hone his skills in the IT field.   It is important that Lonergan maintain a certain level of competence in the ever-expanding and growing IT field.   He was previously enrolled at Prentice Hall University, however, most of their studies have moved to all online, therefore making it almost necessary to have internet to continue his education.

69. Lonergan is being unnecessarily denied information on political candidates as a registered voter within Carlton County.  Being uninformed on political candidates makes

Lonergan restricted from informed voting.   Campaigners routinely interact with the voting public on the internet to direct their campaigns and further their cause for election. However, Lonergan is not afforded this right and privilege due to Defendants unnecessary restrictions on internet and other modern technologies.

70. Lonergan, a Christian man, is unnecessarily restricted from maintaining a significant relationship with his church family, through a ministry he belongs to in Colorado Springs, Colorado.   Over the past five years, this ministry has moved almost all of its teachings and messages to online services.   Additionally, he could also attend Bible College at this ministry if it were not for Defendants' unnecessary restrictions on internet.

71. Lonergan has no direct access to the internet, or his own computer to complete the mundane tasks of everyday life.   These would include shopping.   Lonergan must instead depend on his significant support system living in society to complete these domestic tasks for him.   Lonergan has purchased over the internet for more than $700.00 annually; which may not seem like much.   But when one takes the time to consider that a third-party must complete these mundane domestic tasks for him, this demonstrates how it could cause a friction and contention between his extremely important supportive relationships in society and himself.

72. If the current restrictions placed on Mr.  Lonergan are unnecessary, it is counter therapeutic to the purpose for which he is committed, because maintaining healthy

relationships in society are extremely important to successful treatment and reintegration, which Defendants' place into jeopardy by modern technology restrictions.

73. For Lonergan, video visits are another important tool that could be used. His mother passed away in October of 2018. Bedridden for the last 6 months of her life, Lonergan was unable to properly say good bye face to face. In the last few weeks of her life, Lonergan's mother could not even communicate at all, therefore, making visual visiting even more significant for him. Additionally, Lonergan has also lost two (2) brothers previous to his mother, with similar circumstances; one older brother lived in North Carolina, the younger in a private hospice center.

74. Hogy, a co-founder companies such as; Sunrise Mobile Home Service, Boomerang Café, Boomerang Trucking Service, Hogy Apartments, and Hogy Trucking Independent is being unnecessarily denied by Defendants access to a computer with modern technologies is a burden on the State rather than an asset. Hogy could be a contributor to the tax base and not a deficit. Hogy could maintain gainful employment within one or all of those companies should these unnecessary restrictions cease.

75. Hogy has spent well over $1000.00 annually on internet purchases to buy his needed medical supplies and other necessities not provided by the Defendants, however, he is reliant on outside support to assist in these endeavors creating unnecessary burdens on support and possibly creating tensions in those relationships.

22

76. If the current restrictions placed on Mr. Hogy are unnecessary, it is counter therapeutic to the purpose for which he is committed, because maintaining healthy relationships in society are extremely important to successful treatment and reintegration, which Defendants' place into jeopardy by modern technology restrictions.

77. Adolphson, has had his civil rights restored to him including his right to vote since 1996.   As times progress, it is necessary for Adolphson to have access to modern technologies to be an informed voter and make intelligent political choices.

78. Adolphson, an aged person of 80 years would benefit from having access to modern technologies to access things such as Medicare and Medicaid programs, Social Security, and many other aged programs as all these are online.

79. As an avid foreign film watcher and collector, Adolphson is unable to access information about films to ensure they will cut the muster of Defendants very stringent rules related to media.

80. Due to unnecessary restrictions Adolphson is unable to pursue educational opportunities and religious endeavors.

81. Adolphson and others are restrained from communicating with numerous businesses as they are only allowed one call per month to a business for essential items.    If unnecessary restrictions were not in place Adolphson and others would be able to access

businesses through modern technologies as a means of conducting business and commerce.

82. Adolphson and others are unnecessarily restrained from communicating without being labeled a person from a secure treatment facility; limiting the businesses who are willing to conduct commerce with them.

83. If the current restrictions placed on Mr. Adolphson are unnecessary, it is counter therapeutic to the purpose for which he is committed, because maintaining healthy relationships in society are extremely important to successful treatment and reintegration, which Defendants' place into jeopardy by modern technology restrictions.

84. Hatton has no direct access to the internet, nor does he own a computer to complete the mundane tasks of everyday life.

85. Hatton, a registered voter in the State of Minnesota, is unable to obtain information on candidates to intelligently vote for elected officials.

86. Hatton, an enrolled member of the First Nation Anishinabe in Canada, is unable to maintain constant contact with his tribe including but not limited to studying with a Mdewin[2] elder for which his religious life path has led him on.

87. Hatton could further continue his studies and education in drug and alcohol rehabilitation counseling, for which he has been certified for since 2012.

---

[2] Literally, "sound of the drum /heart doings" or known as the Grand Medicine Society.

24

88. Hatton, if afforded modern technologies would be able to study and learn more about academics and neuroscience, a field of study he has a passion for and communicate with experts who study in this field.

89. Hatton, the father of six children has been stymied from communicating with his children based upon the policies and restrictions placed upon him by MSOP's restrictive policy restraining him from using modern technologies.

90. In 2014, Hatton's customary and traditional wife passed away suddenly, if unnecessary restrictions placed on Hatton by the facility were not in place, Hatton could have attended virtually the funeral and been a part of the ceremony.

91. Additionally, Hatton would have been able to comfort his children as well during these ever trying and heart wrenching moments in time they were experiencing.

92. Hatton, the co-founder of an organization, O.C.E.A.N., which is dedicated to change in the civil commitment system for people who have committed sexual offenses would be able to place articles and other material on the internet himself instead of relying on his ever important support system to assist him in these mundane tasks of life.

93. Hatton would be able to interact with organizations and supporters through Zoom meetings, related to issues specific to O.C.E.A.N.'s mission, if unnecessary restrictions were not placed on him regarding modern technology use.

94. If the current restrictions placed on Mr. Hatton are unnecessary, it is counter therapeutic to the purpose for which he is committed, because maintaining healthy relationships in society are extremely important to successful treatment and reintegration, which Defendants' place into jeopardy by modern technology restrictions.

95. For Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan , maintaining relationships with a support system is directly connected to their successful treatment. Without email, or cellphone, it is next to impossible to maintain these basic human interactions; as nearly everyone in society has moved to the modern era of email and text messaging as their primary artery of human communication.   Even this Court uses the internet as a primary means of conducting business.

96. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  would benefit from having internet and other modern technologies so as to interact with clinical staff, receive updates from the facility, access treatment journals, fill out requests, fill out institutional banking information which would reduce problems with people stealing account information, amongst other things beneficial to the therapeutic environment.

97. Defendants could employ modern technologies as a therapeutic tool to monitor and document internet activities by Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan , which would be beneficial to Defendants.   Knowing these sites Plaintiffs' frequent now could be a good determining factor of "areas of treatment concern" as they further progress through the program.

98. During the Dayton Governorship, Governor Dayton made an Executive Order that **all** citizens (*Id.* Minn. Stat.§ 237.012) (which include Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan ) of the Great State of Minnesota would have access to the internet as the way of the world is moving in a technological direction. Without internet it is next to impossible to function in Minnesota society— indeed, the world.

99. The above list is not a full comprehensive list that is including but not limited to the cause and affects Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan have brought forth as their full set of facts. There are way too many things to list that are effected by Defendants unnecessary restrictions on modern technologies.

100. Since COVID-19 and all the facets that come with it including social distancing and limitations on capacity restrictions, it has become the new norm for the use of Zoom and other similar mediums, not only for human interaction, but also the courts, as they have moved to use of said technology to hold hearings and other court functions.

101. At one time hospitals were lighted by oil lamps. When natural gas became part of the country's infrastructure, oil lamps were swapped out for gas lamps, then finally advancing to the great invention of electrical light bulbs, which themselves have advanced from their inception. Additionally, communication started by Pony Express, then went to telegrams, then the telephone which has had many different facets, then cellphones, to now we have the world at our fingertips through internet communication via many modern technologies. Doctors, if they have a question or concern about an

27

issue, they turn to modern technology to ask questions of their colleagues or other sources.   As the country's infrastructure evolved, hospitals evolved with the country. This is simply all Plaintiffs want **is to evolve with the rest of society**.   All the while, Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  are left in the dark and unable to progress and develop with current times due to the unnecessary restriction by Defendants.

102.   Based on the above factual information and belief, Defendants maintain a custom and practice of discrimination and prejudice against Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  based upon staff convenience, current prejudice, and animus.

103.   As a result of Defendants discriminatory actions, Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  are denied the right to utilize any modern technology, including but not limited to internet, cell phones,  and other mediums representative of communication.   This results in Defendants supporting Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  to remain stuck in the industrial age, and not progress to the cyber age, which results in mental retardation and developmentally disabled.

104.   As a result of Defendants discriminatory actions; Plaintiffs, suffered consequences by not being allowed to communicate as normal citizens of society.   This results in embarrassment, harassment, discrimination and diminished capacity, quality and enjoyment of life, and social and mental retardation and developmental disability.

105.   As a result of Defendants discriminatory actions, Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan continue to suffer intellectual and emotional trauma, intellectual and mental anguish, and emotional distress.

# CLAIMS

### Count I: Defendants Denied Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  First Amendment Rights to Access The Internet, And Access to Many Other Mediums.

106.   Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan   incorporate all previous allegations as if fully set forth herein.

107.   The First Amendment guarantees that "[no] State shall ... deprive any person of the right to freedom of speech so long as it is not such that it violates the law.

108.   Civilly committed patients are entitled to some degree of protection under the First Amendment that is broader than that held by prisoners but less than what is held by members of free society.   Policies or restrictions of First Amendment rights must be reasonably related to legitimate institutional and therapeutic interests as determined by reasonable professional judgment.   Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan   bring this First Amendment claim pursuant to 42 U.S.C.   §§1983, 1985, and1988.

109.   Based on the determination of Defendants to not allow Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  the ability to possess modern devices or technology

29

that would comport with modern forms of communication, interaction and personal responsibility,  therefore depriving Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan of healthy options which are synonymous with normal society.

110. Defendants have denied Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan right to utilize internet or other forms of virtual communication denying them their constitutional rights to speech, association, and press.

111. Unless relief is granted Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan will continue to suffer real and tangible intellectual and mental injury, and they will continue to be injured as a direct and proximate result of each Defendants acts and omissions as specifically set forth above.

### Count II: Denied Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan 's rights to Substantive Due Process as afforded under the Fourteenth Amendment of the United States Constitution.

112. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  incorporate all previous allegations as if they are truly set forth herein.

113. The Fourteenth Amendment entitles people to substantive due process under the law. Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan bring this Fourteenth Amendment claim pursuant to 42 U.S.C. §§ 1983, 1985, and 1988.

114. The Fourteenth Amendment guarantees that "[no] State shall… deprive any person of life, liberty, or property without the due process of law.

115.   Defendants' failure to reasonably accommodate and/or make adjustments to the policy is a failure to allow Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan the right to evolve with society, as other citizens of the United States are afforded.

116.   Based on all the Factual allegations, Defendants continue to maintain a custom and/or practice of discrimination and prejudice against Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  that disallows them the ability to utilize internet and other cyber related equipment, which promote healthy lifestyles, including communication with support and loved ones, friends, courts, religious communities, education, political candidate information/speeches and many other platforms deemed appropriate.

117.   Based on the above factual allegations, Defendants denial of all these rights including allowing modern technologies creates stymied relationships with family, friends, support, educational progression, religious expression, real time interaction with the courts, gaining meaningful information about political candidates who are running for office, intelligent voting, responding to and receiving news in various venues, sharing thoughts and beliefs with others, creating relationships with support organizations such as Alcoholics Anonymous, Narcotics Anonymous, Sex Addicts Anonymous and the Twin Cities Men's Center, just to name a few, which could assist Plaintiffs' in becoming healthier individuals.

31

118.   Based on the above factual allegations, Defendants unlawfully discriminate against Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  by not allowing them the same afforded tools as contemporary society to access internet, educational, religious, court and other cyber based communication.

119.   Unless relief is granted Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  will continue to be injured as a direct and proximate result of Defendants acts and omissions specifically set forth above.

120.   Unless relief is granted Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  will continue to be injured as a direct and proximate result of Defendants acts and omissions specifically set forth above.

## **PRAYER FOR RELIEF**

**Wherefore, Plaintiffs pray for relief as follows;**

A)      To afford Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan  the rights as other citizens of the United States and Minnesota,  regarding personal computer possession, internet use, access to the courts Pacer/ECF system, the Minnesota State equivalent, education, religion, political candidate information, speeches  and emails and video visits with loved ones and support,

B)   Change MSOP Policies 120-5600, 420-5107, and 420-5035 to allow for Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan to have access to and utilize the internet, email, and video visiting to better improve their wellbeing,

C)   Issue an order granting Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan judgment finding that Defendants violated Daywitt, Hatton, Hogy, Adolphson, Whipple, and Lonergan First and Fourteenth Amendment rights of the United States Constitution, and the Minnesota Constitution;

D)   Deem MSOP policies 120-5600, 420-5107, and 420-5035 to be unconstitutional as applied and on their face;

E)   Award Injunctive Damages against Defendant, jointly and severely;

F)   Award Compensatory Damages against each Defendant for any amount greater than $50,000 per Plaintiff per Defendant and;

G)   Award of other and further relief as this Court may deem appropriate.

**The Plaintiffs hereby demand a trial by jury.**

Respectfully Submitted,                          Dated: January 4, 2021

_____                    _____
Kenneth Daywitt                                    Russell Hatton
1111 Hwy 73                                         1111 Hwy 73
Moose Lake, MN 55767                        Moose Lake, MN 55767

_____                    _____
Steven Hogy                                         Merlin Adolphson
1111 Hwy 73                                         1111 Hwy 73
Moose Lake, MN 55767                        Moose Lake, MN 55767

_____                    _____
Michael Whipple                                    Peter Lonergan
1111 Hwy 73                                         1111 Hwy 73
Moose Lake, MN 55767                        Moose Lake, MN 55767

34