# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Kenneth Daywitt, David Jannetta, Steven Hogy, Merlin Adolphson, Michael Whipple, and Peter Lonergan, | Case No. 20-CV-1743 (NEB/KMM) |
| Plaintiffs, | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| vs. | |
| Jodi Harpstead, Marshall Smith, Nancy Johnston, Jim Berg, Jannine Hebert, Kevin Moser, Terry Kneisel, and Ray Ruotsalainen, | |
| Defendants. | |

## INTRODUCTION

Plaintiffs are attempting to relitigate the legality of a legitimate government policy already deemed constitutional by two courts in this District. Specifically, two separate decisions in this District, one of which was handed down about two weeks ago, have affirmed the constitutionality of the Minnesota Sex Offender Program's (MSOP's) restriction on client internet use in the face of First Amendment claims essentially identical to those brought by Plaintiffs in the present matter. This issue need not be litigated a third time.

Plaintiffs' Complaint ("Compl.") should be dismissed in its entirety with prejudice pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure because: (1) as civilly committed persons, Plaintiffs do not have a constitutional right to access the internet under the First Amendment; (2) to the extent pled, any access-to-courts and free

exercise claims fail as a matter of law; (3) Plaintiffs' Fourteenth Amendment substantive due process claim is subsumed by their First Amendment claim; (4) the claims against Defendants in their individual capacities should be dismissed because they are entitled to qualified immunity and Plaintiffs fail to plausibly allege any personal wrongdoing on the part of some Defendants; (5) to the extent Plaintiffs request money damages against Defendants in their official capacities, the claim is barred by the Eleventh Amendment; and (6) to the extent Plaintiffs are attempting to plead other free-standing claims, the claims fail as a matter of law for the reasons detailed herein.

## STATEMENT OF FACTS[1]

### I. BACKGROUND OF THE MINNESOTA SEX OFFENDER PROGRAM.

Plaintiffs Daywitt, Jannetta,[2] Hogy, Adolphson, Whipple and Lonergan ("Plaintiffs") are civilly committed to MSOP as either sexually dangerous persons and/or sexual psychopathic personalities and reside at the program's Moose Lake facility. Compl. at 5-9. They bring this action in a *pro se* capacity. Defendant Harpstead is the Commissioner of the Minnesota Department of Human Services ("DHS"), which oversees and operates MSOP. *Id.* at 9 ¶ 16; Minn. Stat. § 246B.02. Defendant Johnston is the Executive Director of MSOP. *Id.* at 9 ¶ 17. The other named Defendants are all state-employed officers, directors or administrators who are alleged to have some

---

[1] The Statement of Facts accepts, as it must for purposes of this motion to dismiss, the truth of the factual allegations in Plaintiffs' Complaint. *See Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.,* 270 F.3d 637, 638 (8th Cir. 2001). By doing so, Defendants are not admitting to their truth.

[2] Undersigned counsel understands Mr. Jannetta passed away after the filing of the Complaint.

involvement with implementing MSOP policy restricting client internet use. *Id*. at 9-11. Defendants are sued in both their official and individual capacities. *Id*. at 1; 3 ¶ 4.

MSOP provides treatment to individuals committed as sexual psychopathic personalities ("SPP") and sexually dangerous persons ("SDP") in secure treatment facilities located in St. Peter and Moose Lake, Minnesota. Minn. Stat. §§ 246B.02; 253D.02, subds. 13-16. By definition, SPPs and SDPs are persons whom a court has determined to be dangerous. Minn. Stat. §§ 246B.01, subds. 3-4; 253D.02, subds. 15-16.

MSOP assesses every client and develops and implements an individual written treatment plan that identifies the client's needs and establishes goals. Minn. R. 9515.3030, subps. 1, 4. Treatment services "address sex offense behaviors and remediation, and include, as applicable, related topics such as deviant sexual arousal patterns, assaultive behavior, human sexuality, victimization issues, re-offense prevention, and interpersonal relationships." Minn. R. 9515.3040, subp. 1A.

In addition to providing treatment, DHS adopts rules to govern the operation, maintenance, and licensure of secure treatment facilities operated by MSOP. Minn. Stat. § 246B.04, subd. 1; Minn. R. 9515.3000 to 9515.3110. MSOP develops written policies and procedures regarding data privacy, treatment, prevention of abuse and predation among clients, response to allegations of criminal acts committed by clients, monitoring for contraband, and the provision of a safe environment for staff, clients, and visitors. Minn. R. 9515.3040, subp. 2. In addition, MSOP develops policies and procedures to maintain "a secure and orderly environment that is safe for persons in treatment and staff and supportive of the treatment program." Minn. R. 9515.3080,

subp. 1.  Finally, MSOP "specif[ies] rules of behavior for persons in treatment that are consistent with maintaining program safety and supportive of the person's rights to treatment." *Id.*

## II.  PLAINTIFFS' COMPLAINT

Plaintiffs allege MSOP's restriction on client internet use (and other "modern technologies"[3]) violates the First Amendment of the U.S. Constitution (Count I), as well as Fourteenth Amendment substantive due process (Count II). The gravamen of the Complaint is that MSOP's policy denying client access to the internet "unnecessarily restricts" or "stymies" their ability to fully participate in, or receive information about, various facets of life, ranging from religious, social, civic, educational and vocational pursuits to more mundane tasks, such as shopping and learning about birds. *See e.g., id.* at 2; 12 ¶ 31.

Specifically, while the Complaint is over 30 pages long and contains mostly conclusory or vague allegations about the importance of the internet and social media to modern day life, Plaintiffs claim they are "uninformed" because they cannot access online information about politics and candidates, (*see e.g., id.* at 6 ¶ 11; 13 ¶ 36; 15 ¶ 42; 22 ¶ 73; 24 ¶ 80), they cannot file or receive legal documents "electronically," (*id.* at 13 ¶ 36; 19 ¶ 61), and they cannot participate in their faith through online means like live streaming services. *See e.g., id.* at 17 ¶ 53; 19 ¶ 63; 22 ¶ 74.  They claim the lack of internet access prevents them from "furthering" their education as most studies, they assert, have moved online, (*see e.g., id.* at 17 ¶ 54; 20 ¶ 65; 21 ¶ 70; 22 ¶ 72; 24 ¶ 83),

---

[3] Defined in footnote one of the Complaint as "cellphones, computers, laptops, internet, iPads, tablets, other personal communication devices, etc…"

4

and also that they are "restrained" from interacting with businesses as they are only allowed one call to a business per month and cannot use "modern technologies as a means of conducting business and commerce." *Id*. at 24-25 ¶ 84. They also claim the lack of internet access prevents them from fully interacting with social support communities, alleging—among other things—that they are "unnecessarily restricted" from maintaining "personal contact" with friends and family as they cannot use mediums like email, text or video chat, but must instead rely on "simple phone call[s]" and in-person visits. *See e.g., id*. at 20 ¶ 64; 21 ¶ 69; 25 ¶ 86.

Plaintiffs claim that internet access would provide a range of benefits to them, such as online shopping, earning money online and accessing information about sundry issues (e.g., foreign films). *See e.g., id*. at 18 ¶¶ 56-57; 19 ¶ 59; 20 ¶¶ 66-67; 21 ¶ 69; 22 ¶ 75; 23 ¶ 78; 24 ¶¶ 79, 81-82; 25 ¶¶ 87-88.

Although they fail to allege specifically why, Plaintiffs further claim that MSOP's policies on "Client C-Mail," "Client Computer Network," and "Video Visiting" are unconstitutional.[4] *Id*. at 3 ¶ 4. The "Client C-Mail" policy is intended to ensure clients can receive information from family, friends, and others by giving them access to

---

[4] Defendants submit these policies as part of this filing. The policies are public documents that are necessarily embraced by and specifically referenced in the Complaint. They can therefore be considered by this Court without converting the current motion into one for summary judgment. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) ("[C]ourts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned without converting the motion into one for summary judgment.") (citation and quotations omitted.)

incoming electronic messages from persons outside the program. *See* Declaration of Peter Shaw ("Shaw Dec."), Ex. A at p. 1. The "Client Computer Network" policy gives clients the opportunity to access an internal network and computers for, among other things, accessing legal research materials and doing legal work, storing and printing documents, completing treatment assignments, and receiving information from MSOP. *Id*. at Ex. B. The "Video Visiting" policy lets clients engage in video visits with those outside the facility, as outlined in policy and approved by their treatment team. *Id.* at Ex C.

Plaintiffs allege, among other things, that MSOP's internet restriction "unnecessarily isolates them from society," impacts their "enjoyment of life," prevents them from "progress[ing] to the cyber age," and makes them "socially and mentally retarded." *Id*. at 13 ¶¶ 34, 36; 27 ¶¶ 93-94. Plaintiffs seek to have the MSOP policies identified above declared unconstitutional and appear to seek monetary, injunctive, and declaratory relief against Defendants, in both their official and individual capacities, for the alleged violations of their constitutional rights. *Id*. at 31-32.

## STANDARD OF REVIEW

The Complaint should, as detailed below, be dismissed for lack of jurisdiction, under Fed. R. Civ. P. 12(b)(1), or for failure to state a claim on which relief can be granted under Fed. R. Civ. P. 12(b)(6).

Rule 12(b)(1) allows a defendant to move to dismiss a complaint for lack of subject-matter jurisdiction. "In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." *Titus v. Sullivan*, 4 F.3d 590, 593

(8th Cir.1993) (internal citation omitted). In reviewing a Rule 12(b)(1) motion to dismiss, this Court must "accept all factual allegations in the pleadings as true and view them in the light most favorable to the nonmoving party." *Great Rivers Habitat Alliance v. Federal Emergency Management Agency*, 615 F.3d 985, 988 (8th Cir. 2010).

In reviewing a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *See, e.g., Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir.2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.' " *Iqbal*, 556 U.S. at 678, (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rule 12(b)(6) eliminates actions that are fatally flawed in their legal premises, "streamlin[ing] litigation by dispensing with needless discovery and fact finding." *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

Although a *pro se* complaint is to be liberally construed, it must still contain specific facts to support its legal conclusions. *Kaylor v. Fields,* 661 F.2d 1177, 1183 (8th Cir. 1981). While a court should grant some deference to *pro se* pleadings, a court

should not assume facts that are not alleged and that might support the claim a plaintiff makes. *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004).

## ARGUMENT

## I.  Plaintiffs' First Amendment Claims Should be Dismissed.

This is now the third time in recent years a court in this District has been asked to decide the constitutionality of MSOP's restriction on client internet use. *Ivey v. Johnston*, No. CV 18-1429, 202 (PAM/DTS), 2021 WL 120746 (D. Minn. Jan. 13, 2021); *Banks v. Jesson*, No. 11-CV-1706 (SRN/JSM), 2016 WL 3566207, (D. Minn. June 27, 2016). *Banks* was decided in 2016 and *Ivey* was decided about two weeks ago. Although decided at summary judgment, both cases affirmed the constitutionality of the restriction in the face of First Amendment challenges by MSOP clients. In fact, as discussed below, the *Banks* case correctly found that MSOP's internet restriction does not implicate constitutional concerns necessarily meriting further scrutiny under *Turner v. Safley*, 482 U.S. 78 (1987), discussed *infra* at p. 10. Moreover, even if scrutiny under *Turner* is warranted, based on the settled rulings in *Banks* and *Ivey*, as well as the allegations in Plaintiffs' own Complaint, dismissal of Plaintiffs' claims is appropriate at the motion to dismiss stage.

### A.  Plaintiffs Have No Constitutional Right to Access the Internet.

As MSOP clients, Plaintiffs do not have a constitutional right to access the internet (or "modern technologies") within the secure treatment setting. Plaintiffs are all civilly committed individuals whose liberty interests—according to the Eighth Circuit—"are considerably less than those held by members of free society." *Senty-Haugen v. Goodno,*

462 F.3d 876, 886 (8th Cir. 2006). Accordingly, the Eighth Circuit and courts in this District have consistently upheld as constitutional MSOP policies that limit or restrict client access to electronic materials and technologies within the secure treatment setting. *Id.* at 886, n.7 (finding that limitations on computer privileges were "*de minimis* restrictions with which the Constitution is not concerned"); *Pyron v. Ludeman*, No. CIV. 10-3759 PJS/JJG, 2011 WL 3293523, at *5 (D. Minn. 2011), *report and recommendation adopted*, No. 10-CV-3759 PJS/JJG, 2011 WL 3290365 (D. Minn. July 29, 2011), *aff'd sub nom. Hollie v. Ludeman*, 450 F. App'x 555 (8th Cir. 2012) ("The Eighth Circuit has opined that a civil detainee has no constitutional right, under the First Amendment or otherwise, to use a computer at all."); *Semler v. Ludeman*, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *24 (D. Minn. 2010) ("No federal, state or local statute creates a property right for Plaintiffs to possess computers and electronics …."); *Aune v. Ludeman*, No. 09-cv-0015 (JNE/SRN), 2010 WL 145276, at *7 (D. Minn. Jan. 8, 2010) (same).

In 2016, in the *Banks* case cited above, the court was faced with the very issue presented in this case: whether MSOP's policy of restricting client access to the internet violated the First Amendment. 2016 WL 3566207. The district court held it does not, echoing the Report and Recommendation in the case in finding the restriction does not even implicate constitutional concerns that would necessarily require further scrutiny under *Turner v. Safley*. *Id*. at *10 ("MSOP's limitations on detainees' use of computers,

email and the internet do not raise constitutional concerns.").[5]  Although *Banks* was decided at summary judgment, the district court's decision can fairly be read as treating the issue as purely legal.  Put simply, Plaintiffs' suit does not rise to the level of an actionable constitutional claim and should be dismissed as a matter of law.

## B. Even if Plaintiffs' Claims Implicate Some Constitutional Concerns, the Claims Should Be Dismissed Under *Turner v. Safley*.

Even if Plaintiffs' claims did implicate constitutional concerns, dismissal at this stage would be appropriate. Courts in this District analyze the First Amendment claims of civilly committed individuals under a standard adopted and modified from the U.S. Supreme Court's holding in *Turner v. Safley*, 482 U.S. 78 (1987), a case which dealt with the First Amendment rights of prisoners.  *See Banks v. Jesson,* No. CV 11-1706 (MJD/JJK), 2012 WL 13094534, at *6 (D. Minn. Jan. 13, 2012), *report and recommendation adopted,* No. 11-CV-1706 (SRN/JSM), 2016 WL 3566207 (D. Minn. June 27, 2016) (citing various cases applying "modified version" of *Turner* standard to the constitutional claims of civil detainees).  Under the modified *Turner* standard, in

---

[5] Numerous detainee cases from other districts are in accord with *Banks*. *See Irving v. Crawford*, No. 1:09CV161 SMLJ, 2010 WL 1006484, at *3 (E.D. Mo. Mar. 15, 2010) ("Furthermore, a denial of internet access, without more, cannot form the basis for a § 1983 lawsuit as it does not allege a deprivation of a constitutional or federal statutory right"); *see also Walker v. Clark*, No. 2:17-CV-221-D, 2019 WL 5685340, at *10 (N.D. Tex. Feb. 25, 2019), *report and recommendation adopted*, No. 2:17-CV-221-Z-BR, 2019 WL 5685165 (N.D. Tex. Nov. 1, 2019) ("State inmates do not have a federal constitutional right to possess computers or to access the Internet."); *Carmony v. Cty. of Sacramento*, No. CIV S-05-1679LKKGGHP, 2008 WL 435343, at *18 (E.D. Cal. Feb. 14, 2008) ("This court is aware of no case standing for the proposition that civil detainees have a free-standing First Amendment right to access computers and/or the internet. A review of the relevant case law does not support such a claim."); *Hartmann v. Maybee-Freud*, No. CIV. 06-340-KAJ, 2006 WL 2406535, at *3 (D. Del. Aug. 21, 2006) ("There is no constitutional right to internet access.").

deciding the constitutional claims of civilly committed individuals, courts are cautioned to exercise considerable "judicial restraint" since administrators at secure treatment facilities, like prison administrators, are owed a degree of deference in formulating policy so they can "perform their duties safely and effectively." *Id.* (citing *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004)). As such, the court need only determine whether MSOP's alleged restriction is "reasonably related to its legitimate therapeutic and institutional interests." *Semler*, 2010 WL 145275, at *9. Courts have likened the *Turner* standard to rational basis scrutiny. *Berdella v. Delo*, 972 F.2d 204, 209, n.8 (8th Cir. 1992) (characterizing *Turner* as "less-stringent rational basis").

Turner identified four factors a court should consider in evaluating a detainee's First Amendment challenge to institutional policies, specifically "(1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation." *Banks*, 2012 WL 13094534, at *7.

Here, dismissal under the modified *Turner* standard would be appropriate at the motion to dismiss stage. First, as to the first *Turner* factor, as already determined in *Banks* as an alternative reason for dismissing the claim in that case, MSOP's restriction on internet use—"to the extent [it] implicate[s] constitutional concerns at all"—is constitutional under the modified *Turner* standard since it serves important therapeutic and institutional purposes, namely rehabilitation and security. 2016 WL 3566207*, at *10.

The district court in *Ivey* found that the internet restriction serves these same legitimate government interests. 2021 WL 120746 at *2. Plaintiffs' Complaint does not contain any allegations that the interests served by MSOP's internet restriction are somehow different than when *Banks* was decided in 2016 or *Ivey* just decided recently, or that the restriction at issue has changed. The settled holdings in *Banks* and *Ivey*—that the policy serves legitimate therapeutic and institutional purposes—should be applied to the case at hand.

Regarding the second *Turner* factor, Plaintiffs do not allege any plausible factual allegations showing that the restriction serves as an absolute bar to their ability to engage in the various activities they identify in the Complaint. In fact, they affirmatively plead they presently enjoy considerable alternative means of engaging in these activities. For instance, Plaintiffs do not allege that MSOP policies prohibit them from communicating with others about political, religious, civic, or social interests via telephone, mail or through in-person visits. Indeed, they admit they are normally permitted to receive visitors,[6] can make phone calls and can also send and receive mail. Compl. 19 ¶ 60-61; 21 ¶ 69; *see also* Shaw Dec., Ex. A ("Client C-Mail") (illustrating that clients may send and receive mail). Plaintiffs do not claim they are forbidden from seeking and possessing printed materials about politics, religion and other civic or social interests either—only, it seems, that they are unable to do so electronically on preferred social networking sites and the like. *See e.g.,* Compl. at 14 ¶ 39; 15 ¶ 42.

---

[6] Plaintiffs may be referencing the fact that visits from outsiders have been suspended due to COVID-19 precautions at MSOP. Compl. 7 ¶ 12. However, they also appear to acknowledge that visits are allowed in the absence of COVID-19 restrictions. Id. at 19 ¶ 60. In addition, the "Video Visiting" policy indicates that clients may receive "in-person" visits when normal operating procedures are in place. Shaw Dec., Ex. C.

Further, Plaintiffs do not claim they are unable to file lawsuits—in fact, they note they have access to legal research materials and are capable of being "fairly litigious." *Id*. at 12 ¶ 30; 19 ¶ 61.  They do not claim they are being denied access to medical care, only that they cannot set up virtual medical visits. *See e.g., id*. at 18 ¶ 56. Additionally, Plaintiffs do not claim they are unable to practice their faith or that they cannot communicate with others about it—again, only that they are unable to do so via the internet. *See e.g., id.* at 22 ¶ 74.

Nor do Plaintiffs plausibly allege that the restriction on the internet bars them from engaging with other clients, family, and friends, or from maintaining significant social and other interactions with those outside the secure treatment facility. In addition to in-person visits, phone calls and the mail, Plaintiffs note they have the ability to access "significant" outside "support system[s]" for—among other things—the purposes of purchasing items (indeed, some plaintiffs admit they have made thousands of dollars' worth of purchases online while at MSOP (*see e.g.,* id. at 18 ¶ 57)), can contact businesses and are even capable of serving as heads of non-profit organizations that maintain an online presence. *See e.g., id*. at 18 ¶¶ 57-58; 20 ¶ 67; 22-23 ¶ 75; 24 ¶ 79, 84.

The written MSOP policies Plaintiffs allege are unconstitutional ("Client C-Mail," "Client Computer Network," and "Video Visiting") provide further evidence that Plaintiffs can distribute and access information, and connect with family, friends and society, in a meaningful way. Clients can receive incoming electronic messages from persons outside the program; can access computers for—among other things—conducting legal research and legal work, storing and printing documents and receiving

information from MSOP; and have the opportunity to engage in video visits with those outside the facility, as outlined in policy. *Supra* at pp. 5-6.

Plaintiffs can thus phone their congressperson, video visit with family members, chat with their pastor, or write to the editor of their local newspaper. While Plaintiffs apparently believe internet access may somehow enhance or make their lives more efficient, as residents of MSOP with diminished constitutional protections, they do not enjoy the right to engage in whatever form of communication they deem "more convenient," *Banks*, 2016 WL 3566207, at *9 (quoting Judge Keyes' Report and Recommendation), and it is evident on the face of the Complaint they are able to exercise any constitutionally-protected rights through other means. *Ivey*, 2021 WL 120746 at *2 (in dismissing MSOP client's challenge to internet restriction, noting plaintiff had access to mail, telephone, newspapers and other means of information and indicating that "more convenient access" is not the "constitutional standard.")

As to the third and fourth *Turner* factors, Plaintiffs' very own allegations show that accommodating internet use would have a significant "ripple effect" on staff and clients at MSOP, and that there is no "ready" alternative to the internet restriction. *See Turner*, 482 U.S. at 90 ("[W]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.") Barring an absolute restriction on client internet use, Plaintiffs seemingly plead that MSOP staff would need to engage in a "whack-a-mole" game of actively monitoring and preventing

client access to certain internet sites. Compl. at 17 ¶ 50.[7] Plaintiffs claim they would like to enjoy internet access akin to that enjoyed by "normal citizens," including the ability to access the realm of social media. *Id*. at 14 ¶ 39; 27 ¶ 94. However, it is evident that giving Plaintiffs the type of internet access they apparently seek would impose enormous administrative burdens on MSOP staff, who would be required to actively monitor and block—as Plaintiffs characterize it—a nearly limitless, "pervasive" and ever-changing network of communications and information that touches upon nearly aspect of everyday life. *Id*. at 13 ¶ 33. This would certainly be no easy task and serves as another basis for dismissing the claim under the modified *Turner* standard. Moreover, access to such sites would no doubt pose a serious ripple effect on other clients and compromise the legitimate institutional interests in rehabilitation and security that were identified in the *Banks* and *Ivey* decisions.

Indeed, in the *Ivey* case, setting aside the lack of suitable monitoring technology and the unreasonable administrative burdens in-person monitoring would pose, the district court still found that, even if "real-time monitoring" could be put in place, such monitoring "would not prevent MSOP clients from viewing counter-therapeutic content, participating in criminal activity, or communicating with minors, vulnerable individuals, victims and their families[.]" 2021 WL 120746 *3. The facts and circumstances have not changed in the weeks since *Ivey* was decided. Even assuming monitoring could be put in place, as Plaintiffs seem to allege, the district court's settled findings in *Ivey*—namely,

---

[7] This appears to be a tacit acknowledgment that Defendants have some reasonable justification for the policy; namely, that the internet is littered with inappropriate websites and materials that might be unsuitable for clients residing in a secure treatment facility for sex offenders.

that internet access poses a serious ripple effect on the MSOP environment and that there is no ready alternative to the restriction—should also be applied to this case.

Simply put, the parties do not need to engage in lengthy fact discovery for this Court to determine—for the third time in five years—that Plaintiffs' claims fail under *Turner*. Given *Turner*'s deferential "rational basis" standard, the settled findings in *Banks* and *Ivey*, as well as Plaintiffs' very own allegations found on the face of the Complaint, dismissal under *Turner* is appropriate. *See Semler*, 2010 WL 145275, at \*\*10, 16 n. 8, 21 n. 9 (deciding case under the modified *Turner* standard on motion to dismiss where, as to one claim, the court had previously found the challenged policy to be constitutional and, as to other claims, sufficient information had been incorporated into the complaint); *see also Ivey v. Mooney*, No. CIV. 05-1215JMR/AJB, 2006 WL 618110, at \*6 (D. Minn. Mar. 9, 2006) (dismissing at the motion to dismiss stage an MSOP client's First Amendment claims and surmising that the policy at issue "is clearly and reasonably related to legitimate and obvious security interests.")[8]

---

[8] Again, Defendants acknowledge that both *Banks* and *Ivey* were decided at the summary judgment stage. As noted, however, *Banks* essentially held that dismissal was appropriate as a matter of law. Given this and the other case law cited *supra* pp.8-16, Defendants believe it would have been proper for the court in *Ivey* to dismiss at the motion to dismiss stage. *See* No. CV 18-1429 (PAM/DTS), 2019 WL 3987583, (D. Minn. Aug. 23, 2019). Even if this Court were to agree with the *Ivey* decision and find that analysis under *Turner* is required, the posture of this case and the *Ivey* case are different at the motion to dismiss stage: the breadth of the allegations in Plaintiffs' Complaint makes this case distinguishable from *Ivey*. Among other things, unlike Plaintiffs here, the plaintiffs in *Ivey* did not allege on the face of the complaint the considerable alternative modalities MSOP clients can employ to express constitutionally-protected rights and access information. *See* No. CV 18-1429 (PAM/DTS), at Docket No. 1 (Complaint). Moreover, this Court now has the benefit of not one but two decisions from courts in this District upholding the constitutionality of MSOP's internet restriction. As noted, both cases made

**C. To the Extent Pled, The Court Should Dismiss Plaintiffs' Other First Amendment Claims.**

Plaintiffs also reference that the internet restriction has certain effects on their ability to access the courts, (Compl. at 13 ¶ 36; 19 ¶ 61) and practice their faith. *See e.g, id*. at 17 ¶ 53; 19 ¶ 63; 22 ¶ 74. While it does not appear that Plaintiffs are attempting to plead distinct First Amendment claims relating to these issues, the Court should dismiss the claims to the extent it concludes they appear in the Complaint.

### i. Plaintiffs Do Not Allege a Viable Access-to-the-Courts Claim.

"[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741 (1983) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972)). A plaintiff alleging an access-to-courts claim must show that the challenged restriction caused a cognizable injury. *Sabers v. Delano*, 100 F.3d 82, 84 (8th Cir. 1996) The Constitution does not require a state enable a detainee to "litigate effectively" once in court. *Id*. (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). Instead, the plaintiff must show the alleged inadequacies hindered their "effort to proceed with a legal claim…seeking to vindicate basic constitutional rights." *Id*; *Pyron*, 2011 WL 3293523, at *4 (to survive a motion to dismiss, an access-to-courts claim must allege actual harm, such as "the inability to file a complaint or the dismissal of a claim.") The actual injury requirement is an element of standing. *Lewis,* 518 U.S. at 349.

---

settled findings that would be appropriate for this Court to rely upon in dismissing Plaintiffs' claims.

Here, Plaintiffs allege they have access to legal research materials and are capable of being "fairly litigious" while at MSOP. Compl. 12 ¶ 30; 19 ¶ 61. Plaintiffs do not state they are unable to file lawsuits (the present case evidences they can), only that they are unable to do so "electronically." Compl. 13 ¶ 36. In fact, Plaintiffs do not factually identify a single instance where they suffered what would be deemed "actual harm," like the dismissal of a suit, because of the internet restriction.[9] While it seems they believe the internet will make them more efficient litigators and allow them to file and send legal papers electronically and in a timelier manner, such allegations do not rise to the level of actual harm required for an access-to-courts claim. *See Lewis*, 518 U.S. at 355 (the Constitution does not guarantee detainees "the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.")

As such, to the extent one is pled, any access-to-courts claim should be dismissed.

ii.     **Plaintiffs Do Not Allege a Viable Free Exercise Claim Under the First Amendment.**

To succeed on a claim brought under the First Amendment's Free Exercise Clause, a plaintiff must establish that the government has placed a substantial burden on their sincerely-held religious beliefs. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). To find that a government policy constitutes a "substantial burden," the Court must determine that the challenged practice: (1) "significantly inhibit[s] or

---

[9] The Complaint alleges Plaintiff Daywitt is "stymied" from filing and receiving filings "from opposing counsel in a timely manner, or at all[.]" Compl. 19 ¶ 61. It does not allege Plaintiff Daywitt is unable to file lawsuits or has ever had a case dismissed because he was unable to file or receive court papers electronically.

constrain[s] conduct or expression that manifests some central tenet of a person's individual religious beliefs," (2) "meaningfully curtail[s] a person's ability to express adherence to his or her faith," or (3) "den[ies] a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Id.* A finding of a substantial burden on the plaintiff's sincerely-held religious beliefs does not end the analysis. If such burden is found, courts in this district then apply the modified *Turner* analysis discussed at Section I(B). *Karsjens v. Piper*, 336 F. Supp. 3d 974, 992 (D. Minn. 2018).

Plaintiffs do not allege the internet restriction prohibits them from practicing the core tenets of their faith. Nor do they allege any MSOP policy bars them from practicing or espousing their religious beliefs, or from seeking or possessing printed religious materials or from communicating about their faith with others at MSOP or through mail or telephone with those outside the facility. Again, Plaintiffs admit they enjoy alternative modalities for expression (such as the mail, telephone and in-person visits) and can take advantage of significant social networks outside the facility. *See Patel*, 515 F.3d at 814–15 (plaintiff did not offer sufficient evidence that his ability to practice his religion through appropriate diet had been substantially burdened by prison meal plan, where he did not show inadequacy of alternative means by which he could practice his faith).

Plaintiffs are simply alleging they cannot employ *the internet* for accessing religious materials and communicating with others about their faith. However, this does not rise to a viable free exercise claim. While a facility "must permit a reasonable opportunity for [a client] to engage in religious activities [it] need not provide unlimited

opportunities." *Van Wyhe v. Reisch*, 581 F.3d 638, 657 (8th Cir. 2009) (holding that the denial of additional group study time was not a substantial burden on an inmate's ability to exercise his religion because the inmate already received three hours of religious study and worship time each week and was permitted to study the language individually in his cell).

Plaintiffs have failed to allege any "substantial burden" on their religious exercise.[10] Accordingly, to the extent pled, any free exercise claim must be dismissed.

## II. PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM SHOULD BE DISMISSED.

Plaintiffs' Fourteenth Amendment substantive due process claim should be dismissed as a matter of law. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations omitted).

Here, the First Amendment provides an "explicit textual source of constitutional protection" against the complained-about conduct and Plaintiffs' substantive due process claim does nothing more than attempt to refashion their already-pled First Amendment claim under the guise of a different constitutional amendment. As such, the substantive due process claim is subsumed by the First Amendment claim and should be dismissed. *Wickner v. Rose*, No. 17-CV-1214 (DWF/DTS), 2019 WL 3976203, at *2, n.8 (D. Minn. July 3, 2019), *report and recommendation adopted*, No. CV 17-1214 (DWF/DTS), 2019

---

[10] Moreover, even if Plaintiffs alleged a "substantial burden," such a claim would fail under the modified *Turner* analysis for the same reasons cited in Section I(B).

WL 3975678 (D. Minn. Aug. 22, 2019) ("Although *Wickner* has also invoked the Fourteenth Amendment, any substantive due process claim is subsumed by his First Amendment claims."); *see also Banks,* 2012 WL 13094534, at *9 (citing *Albright* in recommending dismissal of Fourteenth Amendment claim subsumed by First Amendment claim).

## III.  PLAINTIFFS' INDIVIDUAL-CAPACITY CLAIMS SHOULD BE DISMISSED.

### A. Defendants' Are Entitled to Qualified Immunity In Their Individual Capacities.

The Court should dismiss Plaintiffs' claims for damages against Defendants because they are entitled to qualified immunity in their individual capacities.[11]  Under the doctrine of qualified immunity, government officials are not liable for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (citation omitted).  "A right is 'clearly established' if the contours of the right are such that a reasonable official would understand that what he or she is doing violates that right."  *Morris v. Clifford*, 903 F.2d 574, 576 (8th Cir. 1990) (citations omitted). By focusing on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law," the test for qualified immunity is intended to both avoid excessively disrupting government functioning and deter unlawful conduct.

---

[11] Qualified immunity does not apply to § 1983 suits for injunctive or declaratory relief. *Frederick v. Morse*, 439 F.3d 1114, 1123 n.46 (9th Cir. 2006), *rev'd on other grounds sub nom., Morse v. Frederick*, 551 U.S. 393 (2007).  However, and as argued herein, Plaintiffs' claims for injunctive and declaratory relief should otherwise be dismissed because Plaintiffs' constitutional rights were not violated.

*Harlow v. Fitzgerald*, 457 U.S 800, 818-19 (1982). Qualified immunity generally "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed*, 500 U.S. 478, 479-480 (1991) (citation omitted).

Assuming, without conceding, that Defendants violated the First Amendment (and Fourteenth Amendment), Defendants are entitled to qualified immunity because the allegations in Plaintiffs' Complaint do not show that Defendants acted in a manner that a reasonable person would know violated clearly established statutory or constitutional rights. As noted earlier, *see supra* pp. 8-16, Plaintiffs have no constitutional right to use the internet (or other "modern technologies" to access the internet) and, at the very least—given the aforementioned holdings from the Eighth Circuit and numerous courts in this District, including the 2016 *Banks* decision in which the court found no constitutional concerns with the very restriction at issue in this case—it is not the case that a reasonable person would have known of any "clearly established" law that prevents MSOP from restricting client access to the internet. *Ivey*, 2019 WL 3334346, at *9 (in suit challenging MSOP's internet restriction for clients, recommending dismissal of individual-capacity claim on qualified immunity grounds after determining the law was "not so clearly established that [Defendant] may be held individually liable for money damages.").

For these reasons, Defendants are entitled to qualified immunity and Plaintiffs' claims for damages against Defendants in their individual capacities should be dismissed.

### B. The Individual Capacity Claims Against Defendants Kneisel and Ruotsalainen Should Be Dismissed For Failure to Plausibly Allege Any Personal Wrongdoing.

To maintain a Section 1983 claim, Plaintiffs must plead sufficient facts supporting how each Defendant was personally involved in an alleged unconstitutional act. *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001) (citing *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999). Absent a showing that individual Defendants were directly and personally involved in alleged misconduct, a Section 1983 action against those persons must be dismissed. *Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir. 1985).

Here, Plaintiffs fail to plead any facts showing that the individual Defendants were involved in any of the events described in the Complaint, let alone facts to show that they were involved in unconstitutional or illegal acts. *See generally* Compl. The Complaint essentially does nothing more than describe these Defendants' job duties and states in conclusory fashion that each Defendant "implemented, retained and carried out policies" that allegedly violated Plaintiffs' rights.

Even so, Defendants concede it can reasonably be inferred some Defendants have responsibility for setting MSOP policy. However, this certainly cannot be said for Assistant Facility Director Terry Kneisel and IT Lead Ray Ruotsalainen. Compl. at 10 ¶¶ 22-23. Because Plaintiffs fail to allege any plausible facts of direct personal involvement by these Defendants, the individual-capacity claims against them should be dismissed. *See Beck*, 257 F.3d at 766 (dismissing section 1983 claims because the plaintiff "failed to allege sufficient personal involvement by any of Defendants to support such a claim").

## IV. To The Extent Plaintiffs Seek Money Damages Against Defendants In Their Official Capacities, The Claim Should Be Dismissed.

The Eleventh Amendment serves as a bar to any purported claims for money damages against Defendants in their official capacities. *Treleven v. Univ. of Minnesota*, 73 F.3d 816, 818 (8th Cir. 1996) ("[T]he Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially for the recovery of money from the state.") (citation and internal quotations omitted).

Here, Plaintiffs name Defendants in their individual and official capacities and ask for money damages. *See e.g.*, Compl. p. 1, 32. The Complaint does not distinguish, however, whether money damages are being sought against Defendants in their individual capacities, official capacities, or both. To the extent Plaintiffs seek money damages against Defendants in their official capacities, the claim must be dismissed under Rule 12(b)(1). *Knutson v. Ludeman*, No. CIV. 10-357 PJS/LIB, 2011 WL 821253, at *3 (D. Minn. Jan. 12, 2011), *report and recommendation adopted as modified*, No. 10-CV-0357 PJS LIB, 2011 WL 808189 (D. Minn. Mar. 1, 2011) (dismissing official-capacity claim seeking money damages against state employees under Rule 12(b)(1)).

## V. To The Extent Plaintiffs Are Attempting To Plead Other Free-Standing Causes Of Action, The Claims Should be Dismissed.

The Complaint makes various allegations about the effects the internet restriction has on Plaintiffs' educational progress and vocational opportunities, as well as their ability to be informed voters. To the extent Plaintiffs are trying to assert separate constitutional claims with respect to these allegations, they should be dismissed.

Plaintiffs do not enjoy a constitutional right to educational or vocational opportunities. *Banks*, 2016 WL 3566207, at *11 (citing *Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992) for proposition that detainees have no constitutional right to educational or vocational opportunities). Additionally, the Constitution does not guarantee Plaintiffs a right to be an informed voter. *Ivey*, 2019 WL 3334346, at *3 n.5 (to the extent it was alleged, finding dismissal of MSOP client's right-to-vote claim appropriate and noting "[t]he Constitution does not specifically recognize a right to vote for any office, but rather restricts a state from treating its electorate in an arbitrary or disparate manner.")

For these reasons, to the extent Plaintiffs are attempting to plead additional free-standing causes of action, the claims should be dismissed.[12]

---

[12] Plaintiffs' Complaint identifies just two counts—a First Amendment claim (Count I) and a Fourteenth Amendment claim (Count II)—but at various times makes vague reference to supposed violations of unspecified "statutory and common law" rights. *See e.g.,* Compl. at 4 ¶ 5. While it is extremely unlikely any statutory or common law claims would be applicable to the conduct at issue in this case, to the extent Plaintiffs are attempting to plead such claims, they should be dismissed. Plaintiffs completely fail to specify what these statutory or common law rights are and leave it to Defendants or this Court to guess. The allegations are wholly insufficient and should not be entertained under the holdings in *Twombly* and *Iqbal*.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety and with prejudice.

Dated: January 25, 2021

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Peter J. Shaw**
PETER J. SHAW
Assistant Attorney General
Atty. Reg. No. 0390720
peter.shaw@ag.state.mn.us

AARON WINTER
Assistant Attorney General
Atty. Reg. No. 0390914
aaron.winter@ag.state.mn.us

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1024 (Voice)
(651) 282-5832 (Fax)

*ATTORNEYS FOR DEFENDANTS*