# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Kenneth Daywitt, et al., | Case No. 20-cv-1743-NEB-ECW |
| Plaintiffs, | |
| v. | **ORDER AND** |
| | **REPORT & RECOMMENDATION** |
| Jodi Harpestead, et al., | |
| Defendants. | |

---

This action comes before the Court on Defendants Jodi Harpestead, Marshall Smith, Nancy Johnston, Jim Berg, Jannine Hébert, Kevin Moser, Terry Kniesel, and Ray Ruotsalainen's (collectively, "Defendants") Motion to Exclude the Plaintiffs' Expert ("Motion to Exclude") (Dkt. 241); Plaintiffs Kenneth Daywitt, Steven Hogy, Merlin Adolphson,[1] Michael Whipple, Peter Lonergan, and Russell Hatton's (collectively, "Plaintiffs") Motion for Summary Judgment (Dkt. 248); Defendants' Motion for Summary Judgment (Dkt. 249); and Plaintiffs' "Motion to Allow Weekly ITV Communication Between Plaintiffs'" ("Motion for ITV Communication") (Dkt. 285).

The case has been referred to the undersigned United States Magistrate Judge for an order on any pretrial motions and a report and recommendation on any dispositive motions pursuant to 28 U.S.C. § 636 and Local Rule 72.1. (*See* Dkt. 270.)

---

[1] Plaintiff Merlin Adolphson passed away during the pendency of this case. (*See* Dkt. 181 at 1; *see also* Dkt. 211 ¶ 2.) Additionally, while David Jannetta is named as a plaintiff in the initial Complaint, he is not named in the First Amended Complaint. (*Compare* Dkt. 1 at 1, *with* Dkt. 26-1 at 1.)

For the reasons stated below, the Court recommends granting Defendants' Motion to Exclude; granting Defendants' Motion for Summary Judgment; and denying Plaintiffs' Motion for Summary Judgment.  The Court also denies the Motion for ITV Communication.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

"The Minnesota Sex Offender Program ('MSOP' or 'Program') was created by the State of Minnesota to securely house and treat sex offenders who are civilly committed because they are determined to be 'sexually dangerous persons.'"  *Banks v. Jesson*, No. 11-CV-1706 (SRN/LIB), 2017 WL 1901408, at *1 (D. Minn. May 8, 2017) (citing Minn. Stat. § 246B.02) (footnote omitted).  "A 'sexually dangerous person' is one who '(1) has engaged in a course of harmful sexual conduct as defined in subdivision 8; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 8.'"  *Id.* (citing Minn. Stat. § 253D.02, subd. 16(a)).  "MSOP is statutorily mandated to enact policies that prohibit persons within the Program (often referred to as 'clients' or 'patients') from obtaining obscene or pornographic materials."  *Id.* (citing Minn. Stat. § 246B.04, subd. 2).  "Clients within the secure treatment facilities operated by MSOP are not permitted to use the internet."  (Dkt. 255 (Declaration of Jannine Hébert) ¶ 4.) MSOP has policies relating to internet and email use, including MSOP's Client C-Mail Policy, Client Computer Network Policy, Computer Internet Streaming Policy, Internet Access Policy, and Mobile Device Use at Program Sites.  (Dkt. 254 (Declaration of Nancy Johnston) ¶¶ 8, 9, 12, 13 & Exs. 8, 9, 12, 13).)

Plaintiffs, who are civilly committed MSOP clients[2] detained at the MSOP facility in Moose Lake, Minnesota[3] filed an initial Complaint against Defendants in their individual and official capacities on August 10, 2020.  (*See* Dkt. 1.)[4]  On January 7, 2021, Plaintiffs filed a motion to amend the initial Complaint, along with a proposed First Amended Complaint Pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 ("First Amended Complaint").  (Dkts. 26, 26-1.)

On January 25, 2021, Defendants filed a motion to dismiss the initial Complaint, and then filed a motion to dismiss the First Amended Complaint on January 27, 2021. (Dkts. 35, 43.)  On January 27, 2021, Plaintiffs filed a motion for temporary restraining order.  (Dkt. 51.)  On June 1, 2021, United States District Judge Nancy Brasel denied Defendants' motion to dismiss the initial Complaint as moot, granted Defendants' motion to dismiss the First Amended Complaint in part, and denied Plaintiffs' motion for temporary restraining order ("Order on Motion to Dismiss").  (Dkt. 76.)[5]  In so ruling, Judge Brasel described Plaintiffs' First Amended Complaint as challenging three MSOP

---

[2]     Persons committed within the MSOP are often referred to as "clients."  *Banks*, 2017 WL 1901408, at *1 (citing Minn. Stat. § 246B.04, subd. 2).

[3]     Plaintiff Kenneth Daywitt has been relocated to MSOP's St. Peter facility.  (Dkt. 195 at 1.)

[4]     Unless stated otherwise, references to page citations refer to the CM/ECF pagination.

[5]     The Order on Motion to Dismiss is available on Westlaw at *Daywitt v. Harpstead*, No. 20-CV-1743 (NEB/KMM), 2021 WL 2210521, at *6 (D. Minn. June 1, 2021).  The Court uses the Westlaw citation in the Analysis section of this Report and Recommendation.

policies ("the Policies") that allegedly restrict Plaintiffs' abilities to use technology in violation of the First and Fourteenth Amendments.  (*Id.* at 2.)  The Policies are: (1) MSOP's Client C-Mail policy which "permits clients' friends and family to send emails to clients but prohibits clients from sending outgoing emails"; (2) a Client Computer Network policy restricting clients from using the internet, limiting clients' use of MSOP-provided computers, and allowing "clients [to] only use computers for 'approved purposes,' such as completing treatment assignments, doing word processing, and conducting legal research and writing"; and (3) a Video Visiting policy permitting "clients to visit with family, friends, or support personnel via videoconferencing software" when the person they are visiting is on "his or her deathbed" and/or to "conduct a 'clinically supported visit.'"  (*Id.* at 2-3 (citing Dkt. 38-1, Ex. A; Dkt 38-1, Ex. B; First Am. Compl. ¶¶ 10-15, 36, 57; Dkt. 38-1, Ex. C).)

Judge Brasel construed the First Amended Complaint as asserting three claims under the First Amendment: (1) a right to access the internet/information claim; (2) a right of access to the courts claim; and (3) a free exercise claim.  (*Id.* at 4-9.)  Judge Brasel also found that Plaintiffs asserted a substantive due process claim under the Fourteenth Amendment.  (*Id.* at 10.)  As to Plaintiffs' right to access the internet/information claim, Judge Brasel considered that claim under the "modified" *Turner v. Safley*, 482 U.S. 78 (1987), factors, and found that it was ill-suited for dismissal on a motion to dismiss due to the fact inquiry required under *Turner* and because

Plaintiffs had alleged sufficient facts to state a claim.[6]  (*Id.* at 6-8 (citing *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 937 (D. Minn. 2014); *Ivey v. Johnston*, No. 18-CV-1429 (PAM/DTS), 2021 WL 120746, at *1 (D. Minn. Jan. 13, 2021).)  Judge Brasel dismissed Plaintiffs' access to the courts claim but found that the First Amended Complaint alleged sufficient facts to survive the motion to dismiss as to the free exercise claim, noting that it was also subject to the modified *Turner* analysis and was a fact-specific issue.  (*Id.* at 8-9 (citing *Karsjens v. Piper*, 336 F. Supp. 3d 974, 992 (D. Minn. 2018), *overruled on other grounds by Karsjens v. Lourey*, 988 F.3d 1047 (8th Cir. 2021).)  Judge Brasel dismissed Plaintiffs' substantive due process claim based on the Fourteenth Amendment, and all "unspecified statutory and common law" claims asserted by Plaintiffs.  (*Id.* at 10 n.9.)

Judge Brasel also found that the Eleventh Amendment barred recovery of monetary damages from Defendants in their official capacities.  (*Id.* at 12.)  And that Defendants were entitled to qualified immunity as to the civil damages claims against them in their individual capacities because Plaintiffs did not allege that they "violated any

---

[6]     In the Order on Motion to Dismiss, Judge Brasel noted that "within the past half-decade two other courts in this District have dismissed similar claims on similar facts. *See Ivey*, 2021 WL 120746, at *1-3 (concluding that the plaintiff's challenge to the MSOP's ban on internet use fails under the modified *Turner* analysis); *Banks v. Jesson*, No 11-CV-1706 (SRN/JSM), 2016 WL 3566207, at *9-10 (D. Minn. June 27, 2016) (finding that the plaintiff had no constitutional right to a computer or to access the internet and even if he did, his claim would fail under the modified *Turner* analysis). The key difference is that those cases are summary judgment decisions and were not decided on the motion-to-dismiss standard. The lack of factual development here makes summary dismissal inappropriate. *E.g.*, *Stone v. Jesson*, No. 11-CV-951 (WMW/HB), 2017 WL 1050393, at *4 (D. Minn. Mar. 17, 2017) (distinguishing cases at the summary judgment stage and explaining that the court cannot conduct a *Turner* analysis on a barren record.") (Dkt. 76 at 8 n.7.)

'clearly established' rights. To the contrary, courts have determined that the MSOP's policies restricting internet usage are not unconstitutional."[7]  (*Id.* at 11.)  Lastly, Judge Brasel found that Plaintiffs adequately alleged that Defendants were personally involved in the alleged constitutional violations.  (*Id.* at 12.)

On June 15, 2021, Defendants filed an answer to the First Amended Complaint. (Dkt. 78.)  On November 4, 2021, Plaintiffs filed a Motion for Class Certification Pursuant to Fed. R. Civ. P. 23(b)(2) along with a supporting memorandum and declarations, which was denied on March 23, 2022.  (Dkts. 85, 87, 88-150, 159, 228.)  On January 27, 2022, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint, along with a supporting memorandum.  (Dkts. 180, 181.)  That motion was denied on March 23, 2022, making the First Amended Complaint the operative complaint in this case.  (Dkt. 228.)  The parties' request to conduct depositions were granted.  (Dkts. 183, 190, 196, 202, 229.)

On November 1, 2022, Defendants filed the Motion to Exclude as well as their Motion for Summary Judgment.  (Dkt. 241, 249.)  Plaintiffs also filed their Motion for Summary Judgment on November 1, 2022.  (Dkt. 248.)  On December 2, 2022, Plaintiffs filed the Motion to Allow ITV Communication.  (Dkt. 285.)  On December 14, 2022, Plaintiff Kenneth Daywitt sought permission from the Court to respond to Defendants' Motion for Summary Judgment and Motion to Exclude, which was granted in part on January 5, 2023.  (Dkts. 295, 313.)

---

[7]     Judge Brasel noted that the immunity did not apply to Plaintiffs' claims for injunctive and declaratory relief.  (Dkt. 76 at 11 n.10.)

6

This matter is now ripe for decision.[8]

## II.    LEGAL STANDARD

**A.    Exclusion of Expert Testimony and Opinions Under Rule 702 and *Daubert*[9]**

Rule 702 governs the admission of expert testimony and states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Before accepting the testimony of an expert witness, the trial court is charged with a 'gatekeeper' function of determining whether an opinion is based upon sound, reliable theory, or whether it constitutes rank speculation." *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 979 F. Supp. 2d 981, 998 (D. Minn. 2013) (citing *Daubert*).  A proposed expert's testimony "must meet three prerequisites to be admissible," including: (1) "evidence based on scientific, technical or other specialized knowledge must be useful to the fact-finder in deciding the ultimate issue of fact"; (2) "the proposed expert must be qualified"; and (3) "the proposed evidence must be

---

[8]     The Court only discusses the remaining issues in the First Amended Complaint in this Order and Report and Recommendation, which are Plaintiffs' claim for their right to access the internet/information claim and their free exercise claim under the First Amendment.  (*See* Dkt. 76 (dismissing all other claims presented in the First Amended Complaint).)

[9]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

reliable." *Id.* (citations omitted).  The Court considers the following in determining reliability: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known rate of potential error; and (4) whether the theory has been generally accepted." *Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006).  "The purpose of these requirements 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *City of Farmington Hills Emps. Ret. Sys.*, 979 F. Supp. 2d at 998 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

"The Court's focus should be on whether the testimony is grounded upon scientifically valid reasoning or methodology." *Id.*  The proffered testimony must be useful to the fact-finder, the expert must be qualified, and the proposed evidence must be reliable. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  The proponent of the expert testimony bears the burden of showing by a preponderance of the evidence that the testimony is admissible. *Id.*  "[R]ejection of expert testimony is the exception rather than the rule," and expert testimony should be admitted if it "advances the trier of fact's understanding to any degree." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006)).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis of the opinion in cross-examination." *City of Farmington Hills Emps. Ret. Sys.*, 979 F. Supp. 2d at 998 (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d

8

924, 929-30 (8th Cir. 2001)).  "Only if the expert's opinion is so fundamentally

unsupported that it can offer no assistance to the jury must such testimony be excluded."

*Id.* (quoting *Bonner*, 259 F.3d at 929-30).

**B.      Summary Judgment**

Summary judgment is appropriate where there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  As

this wording suggests, the initial burden of showing that no genuine issue of material fact

exists lies with the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A

factual dispute is "material" only if resolving it might affect a suit's outcome under the

governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Furthermore, a factual dispute is "genuine" only if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Id.*; *see also Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'") (citation omitted).  When assessing a summary judgment

motion, a court should draw all justifiable inferences in the nonmovant's favor.

*Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59

(1970)).

When a motion for summary judgment has been made and supported by the

pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing

the motion to proffer evidence demonstrating that a trial is required because a disputed

issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586-87 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).  "In evaluating the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence."  *Duluth News-Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1098 (8th Cir. 1996); *see also JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995) ("[A] successful summary judgment defense requires more than argument or re-allegation; [the party] must demonstrate that at trial it may be able to put on admissible evidence proving its allegations.").  Indeed, Rule 56(c) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" and a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  *See* Fed. R. Civ. P. 56(c)(2), (4).

When ruling on a motion for summary judgment, the Court is not required to adopt the plaintiff's version of the facts when those facts are "so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them."  *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'"  *Id.* at 790-

91 (cleaned up). When considering a motion for summary judgment, pleadings submitted by pro se litigants are held to less stringent standards than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). Nevertheless, claims of even a pro se plaintiff cannot survive a motion for summary judgment unless the plaintiff has set forth specific facts demonstrating that there is a genuine issue for trial. *See Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

Given this framework, the Court turns to the parties' motions and begins with Defendants' Motion to Exclude.

## III.   ANALYSIS

### A.   Motion to Exclude

Defendants seek to exclude Plaintiffs' expert, Patrick O'Leary, pursuant to *Daubert* and Federal Rule of Evidence 702, because:

> [Mr.] O'Leary's opinion consists of cut-and-pasted hearsay material from the internet, offered through the lens of someone with no formal training or recent personal experience with internet monitoring, email filtering, or mobile device management. He describes no reliable method on which his opinion is based. And large swaths of his report comment and opine on issues on which he admits he is no expert. In short, Mr. O'Leary's testimony and opinions fail Rule 702 and the *Daubert* test.

(Dkt. 244 at 1.)

### 1.   Mr. O'Leary's Credentials and Report

Mr. O'Leary earned his bachelor's degree in electrical engineering/computer science in 1987 and a master's in business administration in 2020. (Dkt. 245-1, Ex. 1 at

11

16.)  In 2011, he "completed seven IT security certifications with ISC2, EC-Counsel, and Comp-TIA," identified as "(CISSP [Certified Information Systems Security Professional)], CEH [Certified Ethical Hacker], CHFI [Computer Hacking Forensic Investigator], etc.)."  (*Id.*)  He states he has "been admitted to the 1st, 2nd, 3rd, and 5th Federal Circuits as an Internet subject-matter expert," has testified in "other Federal Courts as an Expert Witness or Litigation Support Consultant," and claims experience in the: "**Internet technical** areas of **Security**, **Programming**, Databases, Websites, SEO, Engineering, **Software**, Hardware, Networking, Routing, Life-cycle, Risk Management, Information Technology (IT), Facility Maintenance/Construction, Social Networking, Linux, Apache, MySQL, PHP, C#, HTML, Big Data platforms and content management systems like Drupal."[10]  (*Id.* at 16-17.)  He states: "I am considered a qualified expert in the above-mentioned fields."  (*Id.* at 17.)

Mr. O'Leary's Report, signed on August 5, 2022, provides opinions on numerous topics, including "solutions that will resolve" the "Internet Web Access Dispute" (*id.* at 50-66), "Email Access Dispute" (*id.* at 67-71) and the "Mobile Device Dispute" (*id.* at 77-87).  He asserts as a "**FACT**" that: "There is no risk or threat to public safety as **Step #1** of the recommended solution will deliver **100%** effectiveness."  (*Id.* at 26.)  He makes a number of other statements, such as "MSOP leadership appears to be working overtime to keep the clients from getting limited, filtered, and monitored Internet access" and

---

[10]   All emphases (bold, underline, italics, etc.) in quotes from Mr. O'Leary's Report are original.

**"[t]his Expert Report will expand on and support these statements and Plaintiff's position entirely *with* solid professional opinions**." (*Id.* at 27.)

Mr. O'Leary begins his report with an overview of content filtering, blocking, and monitoring software. (*Id.* at 32-42.) He then reviews various products, including those used by the provisional discharge program and Minnesota Department of Corrections, based on "Google searches," which he asserts "quickly yield[ed] many pages of links/solutions that would explain or implement what the Plaintiffs are requesting. There was no need to attend a conference, seminar, or continuing education course to find this information." (*Id.* at 43-49.) Mr. O'Leary next identifies WebTitan as the product to "resolve" the Internet web access dispute. (*Id.* at 50-59.) In doing so, he asserts:

> According to the MSOP executive clinical director, Jannine Herbert [sic], no MSOP client profile is the same. Hence, MSOP could use the granular feature of WebTitan (*with an Active Directory instance*) to customize and improve its clinical protocols and practices due to having unique behavioral data for each client from the WebTitan reporting system.
>
> This granular feature would also be invaluable to the MSOP provisional discharge program as it would spot issues in an MSOP's client's progress long before a Provisional Discharge (PD) is considered. Hence, the Provisional Discharge program would avoid many failures.
>
> Therefore, a significant win for public safety, one of the concerns she raised in her deposition — done problem solved!

(*Id.* at 57.) Mr. O'Leary concludes as to WebTitan: "**There is no reason why the Defendants cannot be reasonable and implement this product for the Plaintiffs.**" (*Id.* at 59.)

As for the "email dispute," Mr. O'Leary identifies SpamTitan, which "scans all outbound emails for spam, content, and malware and blocks any emails that may result in

an organization's IP address being blocked.  For this scenario, this product could monitor email content sent to recipients."  (*Id.* at 68.)  He identified ArcTitan because it "allows for the long-term archiving of emails."  (*Id.*)  As to public safety, based on these products, he asserts again, "*done, problem solved!*"  (*Id.*)

Finally, as to mobile devices, Mr. O'Leary identified mobile device management ("MDM") software, which "is required for Apps, Content, and Security on Mobile Devices and other endpoints."  (*Id.* at 73.)  He recommended MobiControl as the solution for this problem.  (*Id.* at 78.)

With respect to implementation of these solutions, Mr. O'Leary recommended step-by-step implementation, but asserted that he was "**not talking about a do-nothing paper study that many MSOP/DHS[11]/MNIT[12] bureaucrats would talk about over coffee for three years!**"  (*Id.* at 80-81; *see generally* 80-87.)  He further "suggest[s] that the Court order a three-year proof-of-concept implementation, whereby experts like myself and **knowledgeable** people at TitanHQ (WebTitan) would launch a solution for MSOP" and asserts that he is "***talking about a real, live, usable, implemented solution***," which he believes "***could be up and running in under 30 days.***"  (*Id.* at 81.)  According to Mr. O'Leary, the "step-by-step implementation with a special master or MSP oversight squelches all excuses by the Defendants — *done, problem solved!*"  (*Id.* at 87.)

---

[11]     Minnesota Department of Human Services is generally referred to as "DHS."

[12]     MNIT, or Minnesota Information Technology Services, "is the central IT organization for the State of Minnesota."  *Minnesota IT Services*, https://mn.gov/mnit/ (last visited July 27, 2023).

The remainder of the Report contains criticisms of Declarations offered by Defendants and Defendants' deposition testimony, framed as a rebuttal (*id.* at 88-103, 112-15), and Mr. O'Leary's report "on the ***results*** and ***findings*** of the sex-offender recidivism studies that were done by ***well-known*** sex-offender industry qualified professionals" (*id.* at 104-11). Mr. O'Leary's rebuttal contains opinions such as: "a person can only conclude that Defendants are": "Giving personal opinions [a]s no data or science-based evidence was given. No professional opinions were given . . . [u]nknowledgeable or not trained in Information Technology . . . [o]perating with a personal bias . . . [b]eing uncooperative bureaucrats [and] [l]astly, just completely lazy or incompetent."[13]  (*Id.* at 118.)  He also asserts: "**The Defendants are being absolutely silly and unreasonable!**"  (*Id.* at 101.)  As to his recidivism section, Mr. O'Leary states: "This gathering and reporting on my part is purely ***data forensics***.  Given my credentials, data forensics is undoubtedly within my skillset."  (*Id.* at 104.)

Mr. O'Leary concludes: "**For the record, I apologize for being so direct in my report; I needed to call out the bureaucracy, contradictions, and personal opinions/bias for what it is to make specific points for the Court.**"  (*Id.* at 119.)

### 2.     Analysis

As a threshold matter, Plaintiffs argue that the Motion to Exclude should be denied as untimely because it is a *motion in limine* or nondispositive motion that relates to discovery issues.  (Dkt. 271 at 1 (citing Dkt. 84 and referencing June 1, 2022 as the

---

[13]     Exhibit D1 contains Mr. O'Leary's notes and analysis of Defendants' depositions. (Dkt. 245-1 at 130-168.)

deadline for nondispositive motions).)  This argument lacks merit.  District of Minnesota Local Rule 7.1 states that "motions to exclude experts under Fed. R. Evid. 702 and *Daubert*" are "considered dispositive motions."  D. Minn. LR 7.1(c)(6)(D).  The scheduling order in this case set November 1, 2022 as the dispositive motion deadline.  (*See* Dkt. 84 at 4.)  Defendants filed their Motion to Exclude and supporting materials on November 1, 2022.  (*See* Dkts. 241-245, 245-1.)  Consequently, Defendants' Motion to Exclude is timely.

Next, Defendants seek exclusion of Mr. O'Leary on the basis that he is not qualified as an expert on the topics he opines on because he is "someone with no formal training or recent personal experience with internet monitoring, email filtering, or mobile device management" and "large swaths of his report comment and opine on issues on which he admits he is no expert."  (Dkt. 244 at 1.)  They argue: "Mr. O'Leary has personal experience implementing internet filtering, blocking, and monitoring software from 1990-1999, but not since.  Mr. O'Leary has never implemented a Cisco Umbrella[14] installation and does not have any personal experience implementing WebTitan products."  (*Id.* at 2-3 (citations omitted).)  Defendants further argue that Mr. O'Leary admitted he is not an expert in sex offender recidivism and treatment.  (*Id.* at 5 (citing Dkt. 245-1, Ex. 1 at 103-10).)  Plaintiffs respond that Mr. O'Leary covered content

---

[14]     Cisco Umbrella is used by MSOP to monitor employees' web browsing.  (*See* Dkt. 262-6 (Deposition of Christopher Luhman) at 25:3-27:10) (referred to as "SYSCO Umbrella" in the deposition transcript).)  Citations to deposition transcripts are in line:page format.

monitoring, email monitoring, and filtering at a high level when obtaining his

certifications in 2011, Defendants have not explained why more recent training is

required, and that Defendants failed to disclose that Mr. O'Leary was an expert in another

case "with very similar facts."  (Dkt. 271 at 5-6, 17-18.)

Rule 702 requires an expert to be qualified "by knowledge, skill, experience,

training, or education."  Fed. R. Evid. 702.  Mr. O'Leary has no experience in the areas of

sex offender treatment or recidivism; he has no education, work experience, or training

related to a detention facility; he has never worked in a detention facility; and he has

never consulted, provided an opinion, nor obtained any education or experience related

specifically to any kind of security issue at a detention facility.  (Dkt. 245-1, Ex. 2 at

20:9-24:19.)  The Court recommends exclusion of Mr. O'Leary's opinions insofar as they

relate to sex offender treatment and recidivism, the risks posed by internet access at a

detention facility, or the "reasonableness" of any proposed solution, as he has no basis for

providing such opinions.  *See Onyiah v. St. Cloud State Univ.*, Civ. No. 08-4948

(MJD/LIB), 2011 WL 1868794, at *6 (D. Minn. May 16, 2011) (finding expert did not

have the requisite qualifications to be considered an expert in the field of university

salaries and that his statement that "he is a professor of Mathematics is irrelevant with

regard to offering an opinion on how much Plaintiff initially should have been making"),

*aff'd*, 684 F.3d 711, 721 (8th Cir. 2012), *cert denied*, 568 U.S. 1213 (2013); *see also*

*Olson v. Macalester Coll.*, No. 21-cv-1576 (ECT/DJF), 2023 WL 4353820, at *24 (D.

Minn. July 5, 2023) (excluding expert's opinions because the expert failed to "identify

what scientific, technical, or other specialized knowledge" she possessed "that might

enable her to opine regarding these matters" and her resume disclosed "no education, training, or experience in the area"). As to Mr. O'Leary's opinions on the technical capabilities of his proposed solutions, the Court is not persuaded that decade-old certifications at which content monitoring and email monitoring and filtering were covered "at a high level" qualify Mr. O'Leary to offer those opinions—particularly when Mr. O'Leary has no memory of what was covered when obtaining those certifications. (Dkt. 245-1, Ex. 2 at 14:18-15:6.) As for the fact that Mr. O'Leary was deemed qualified to testify on such topics over 20 years ago, in 2001 (Dkt 245-1, Ex. 2 at 32:14-35:15; 42:2-44:11), that does not provide sufficient qualification for his opinions about technology developed decades later. Indeed, Mr. O'Leary's only experience with implementing internet or email monitoring software occurred before 2000, and involved "proprietary solutions" instead of the "turnkey software" (WebTitan, SpamTitan, ArcTitan, and MobiConnect) he identifies as solutions in his Report. (*See id.* at 87:6-94:23.) Further, Mr. O'Leary's investigation of the turnkey software was limited to internet research and some phone/video conferences with WebTitan, including a 30-minute live product demo. (*See id.* at 74:21-79:22, 98:15-107:9; *see also* Dkt. 245-1, Ex. 1 at 32-49 (describing software); *id.* at 124-27 (Report's Exhibit B showing websites searched).) While Mr. O'Leary's background may theoretically qualify him to explain terminology and some limited aspects of the turnkey software, it certainly does not qualify him to testify as to that software's effectiveness, as he has no more insight into the software's effectiveness, much less its effectiveness in the institutional setting of

18

MSOP, than any layperson who reviewed the materials and spoke with WebTitan's representatives.

Even if Mr. O'Leary has some minimal qualifications in the area of modern-day content and email monitoring software, his opinions should be excluded because they are not "the product of reliable principles and methods." *See* Fed. R. Evid. 702(c).  In making this determination, a court's focus is on an expert's methodology, not his or her conclusions. *Bonner*, 259 F.3d at 929-30.  Here, Defendants argue that Mr. O'Leary's opinions are nothing more than a "vehicle for hearsay." (Dkt. 244 at 10-11.)  Plaintiffs respond that the video conference Mr. O'Leary had with WebTitan representatives constitutes "independent research and testing of the product" and that his "method of conducting Google research was for the benefit of showing Defendant's [sic] just how simple it was to do some research." (Dkt. 314 at 7, 9.)

"Rule 703 requires that if experts rely on otherwise inadmissible hearsay, that expert's opinion may be admitted only to the extent that the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *United States v. Martinez*, 3 F.3d 1191, 1197 (8th Cir. 1993) (cleaned up).  "[T]rial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Williams v. Illinois*, 567 U.S. 50, 80 (quoting Fed. R. Evid. 702(a)).  The Court is not persuaded that an expert would rely on generalized product and sales information from the internet and a 30-minute product

demo when forming opinions about whether specific software could adequately monitor, block, and filter internet and email in the MSOP setting—much less rely **solely** on such material.  Mr. O'Leary did not perform any testing representative of an installation and implementation of the turnkey software at MSOP or identify or rely on any third-party or peer review of the turnkey software's effectiveness in an MSOP setting.  He also did not perform any testing or rely on any third-party or peer review of the turnkey software to determine if the manufacturer's effectiveness claims are even accurate.  In sum, Mr. O'Leary's theory that the turnkey software he identified will be 100% effective in blocking, filtering, and monitoring internet and email access at MSOP has not been tested, has not been subjected to peer review and publication, has no known error rate, and has no standards controlling its implementation.  *See Smith*, 462 F.3d at 923 (listing relevant factors).  Indeed, there has been no testing or peer review of the turnkey software in general—Mr. O'Leary relies only on the manufacturer's statements.  There is "simply too great an analytical gap between the data"—which constitutes a few statistics from the software developers' websites—"and the opinion proffered"—that this software will be 100% effective and solve the problems at MSOP relating to client's internet and email access.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Plaintiffs have not met their burden of showing that Mr. O'Leary's opinions that the turnkey software "solve[s]" the problems of internet and email filtering, monitoring, and blocking at MSOP with 100% effectiveness is reliable.  *See Lauzon*, 270 F.3d at 686.

Mr. O'Leary also opined that WebTitan "offers better pricing for software licensing" (Dkt. 245-1 at 66) but did not provide any pricing analysis or estimates of what

it would cost for MSOP to implement the turnkey software, rather stating "MSOP spends over 100 million dollars per year, I am sure they can find a way to fund this recommended solution for providing this limited, filtered and monitored internet access to its clients." (*Id.* at 87; *see also* Dkt. 245-1, Ex. 2 at 149:21-154:19 (Mr. O'Leary "willing to guess," but stating he did not "want to get into [the cost of just using WebTitan for MSOP] in the deposition," and making a "qualitative" estimate with "large assumptions").)  Mr. O'Leary did not provide an estimated cost for implementing and operating any of the turnkey software in his Report or deposition, and indeed has no basis to do so.  Any such opinions as to cost should be excluded.  *See Onyiah*, 2011 WL 1868794, at *7 (excluding expert's opinion regarding university faculty member's salaries because "the report and proposed testimony is speculation. . . .  Dr. Kalia's assignment of Plaintiff to a random starting salary is 'devoid of competent, factual predicates,' and thus must be excluded").

The Court concludes with Mr. O'Leary's opinions as to the motivations, biases, reasonableness, and credibility of Defendants and MSOP.  "Lay juries routinely assess questions like the presence or absence of bias or the credibility of witnesses without expert testimony."  *Olson*, 2023 WL 4353820 at * 24.  Mr. O'Leary's testimony on these issues would not "help a jury 'to understand the evidence or to determine a fact in issue.'"  *Id.* (quoting Fed. R. Evid. 702(a)).  His opinions as to the motivations, biases, reasonableness, and credibility of Defendants should be excluded.  *See id.* ("The better answer is that a jury would not benefit from Dr. Brandon's testimony or expert knowledge to understand or resolve these questions here.").  Similarly, to the extent Mr.

21

O'Leary opines on legal conclusions, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). For all of these reasons, the Court recommends exclusion of Mr. O'Leary's Report and opinions.

Finally, the Court turns to Plaintiffs' request that the Court extend the nondispositive motion deadline for Plaintiffs so that they can bring a motion to exclude Defendants' experts and for sanctions against Defendants due to "lawyering." (Dkt. 271 at 1-2. (citing Dkt. 272).) The Court recommends denying both. Plaintiffs' request for an extension of the nondispositive motion deadline should be denied for failure to comply with Local Rule 16.3 insofar as they have not filed a motion, *see* D. Minn. LR 16.3(a) (request to modify schedule must be made by motion) or shown good cause and described the effect on any deadlines, *see* D. Minn. LR 16.3(b)(1)-(2). Specifically, as to good cause, Local Rule 7.1 is clear that "motions to exclude experts under Fed. R. Evid. 702 and *Daubert*" are dispositive motions, D. Minn. LR 7.1(c)(6), and the schedule set November 1, 2022 as the deadline for dispositive motions (Dkt. 84 at 4). Plaintiffs, regardless of their *pro se* status, are required to comply with procedural and local rules. *Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir.1983) (per curiam). Plaintiffs' misunderstanding of the deadline to file a motion to exclude Defendants' experts does not constitute good cause. Plaintiffs also request Rule 11 sanctions or an order to show cause under Rules 11(c)(3) and (4). (Dkt. 271 at 2.) The request for an order to show cause appears to be an attempt to circumvent the requirements under Rule 11(c)(2) for a motion for sanctions, including that the motion "must be made separately from any other motion

22

and must describe the specific conduct that allegedly violates Rule 11(b)" and the pre-filing service requirements.  *See* Fed. R. Civ. P. 11(c)(2).  The Court sees no basis for an order to show cause as to Defendants' conduct in filing the Motion to Exclude.  To the extent Plaintiffs are seeking sanctions, Plaintiffs have not complied with Rule 11(c)(2).  The Court recommends denial of Plaintiffs' request for relief under Rule 11.

The Court turns to the parties' Motions for Summary Judgment.

**B.     Motions for Summary Judgment**

The parties brought cross-Motions for Summary Judgment.  (Dkts. 248, 249.)  As stated previously, the remaining claims in the First Amended Complaint are Plaintiffs' right to access the internet/information claim and their free exercise claim under the First Amendment.  (*See* Dkt. 26-1; *see also* 76.)  The Court discusses these claims below.

**1.     Access to the Internet/Information**

In the First Amended Complaint, Plaintiffs contend that the Policies preventing clients from accessing the internet are unconstitutional as they prevent them from obtaining information on the internet and accessing emails and telephone and video calls in violation of the First Amendment.  (Dkt. 26-1 ¶¶ 4, 6, 24-111.)  Plaintiffs seeks injunctive and declaratory relief for the alleged constitutional violation.  (*Id.* ¶¶ 5, 9.)

**a.     Applicable Standard**

Because much of the parties' arguments are dedicated to the applicable standard, the Court begins with this issue.  Plaintiffs rely on the standard set forth in *Packingham v. North Carolina*, 582 U.S. 98 (2017).  (*See* Dkt. 260 at 6; *see also* Dkt. 280 at 23; Dkt. 287 at 7.)  While Plaintiffs previously argued for the applicability of *Turner*, *supra*, (*see*

Dkt. 64 at 11), they now argue that *Turner* does not apply to the instant issue and that the standard enumerated in *Bell*[15], as "incorporated" in *Karsjens*, 988 F.3d 1047, applies here (Dkt. 280 at 26-33; *see also* Dkt. 287 at 1-3, 8, 10-14; Dkt. 315 at 9-12).

However, the Court need not delve further into this issue because it has already been decided by Judge Brasel in the Order on Motion to Dismiss. *See Daywitt*, 2021 WL 2210521, at *2 n.5. That Order stated:

> Plaintiffs heavily rely on *Packingham v. North Carolina* to argue that they have a constitutional right to access the internet generally, and social media specifically. But *Packingham* dealt with restrictions on the use of social media by registered sex offenders, including those who had completed their sentences. Civilly committed people, after all, have less liberty interests than members of the public.

(*Id.* (citations omitted).)

Judge Brasel therefore applied the modified *Turner* test to Plaintiffs' access to internet/information claim:

> Assuming that Plaintiffs have a First Amendment right to receive information, the Court analyzes their claim under the modified *Turner* analysis that courts in this District have applied to MSOP clients' constitutional claims. *E.g.*, *Karsjens*, 6 F. Supp. 3d at 937 (citing *Turner v. Safley*, 482 U.S. 78 (1987)); *Ivey*, 2021 WL 120746 at *5-6.

(*Id.* at 6 (footnote omitted).)

"When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This principle applies to both appellate decisions and district court decisions that have not been appealed." *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 326 F.R.D. 513, 528 (D. Minn. 2018)

---

[15]   *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

24

(cleaned up).  Moreover, "[t]he law of the case doctrine specifies that once a court decides a rule of law, that decision should govern the same issue in all stages of the case. . . .  Law of the case provides consistency, promotes efficiency, and avoids relitigation of settled issued." *United States v. Wolf*, No. 22-cr-137 (KMM/DTS), 2022 WL 16699808, at *2 (D. Minn. Sept. 27, 2022)).  Consequently, the Court applies the modified *Turner* test to Plaintiffs' access to the internet/information claim.

### b.     Evidentiary Challenges

Plaintiffs make certain evidentiary challenges to Defendants' evidence submitted in connection with summary judgment.  The Court addresses those challenges next.

"The evidence supporting a summary judgment motion, including the statements or information contained in affidavits or declarations, should be admissible at trial.  Thus, 'inadmissible hearsay evidence' cannot be considered at the summary judgment stage." *Gilmore v. City of Minneapolis*, Civ. No. 13-1019 (JRT/FLN), 2015 WL 1189832, at *5 (D. Minn. Mar. 16, 2015), *modified sub nom. Gilmore v. Duboc*, 2015 WL 3645846 (D. Minn. June 10, 2015), *aff'd sub nom. Gilmore v. City of Minneapolis*, 837 F.3d 827 (8th Cir. 2016) (citations omitted).  "[T]he requirement of authenticating or identifying an item of evidence" is satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is.'" Fed. R. Evid. 901(a); *see also Felix v. Rios*, Civil No. 08-4925 (PAM/RLE), 2009 WL 2958001, at *3 (D. Minn. Sept. 10, 2009) ("Rule 901 mandates only that the authentication requirement as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. . . .  The Rule then notes that the testimony of a

25

witness with knowledge suffices.") (cleaned up).  "Where a witness authenticates a document as accurate, and the record establishes the witness's qualification to authenticate the document, the district court does not abuse its discretion in finding that the authentication is reliable and the document is authentic."  *Stojkowski v. Fisher*, Civ. No. 10-2390 (PJS/LIB), 2011 WL 1831680, at *3 (D. Minn. April 18, 2011) (citing *United States v. Two Elk*, 536 F.3d 890, 905 (8th Cir. 2008); *United States v. Coohey*, 11 F.3d 97, 99 (8th Cir. 1993) ("to meet the authentication standard 'the proponent need only demonstrate a rational basis for its claim that the evidence is what the proponent asserts it to be')").

Plaintiffs generally argue that "the depositions completed in this case are now directly relevant to the veracity of" Defendants' Motion for Summary Judgment and "supporting declarations" because the Declarations submitted in this case "are identical duplicates" to those submitted in a separate case.  (Dkt. 280 at 10 n.7.)  To the extent Plaintiffs argue that the Court should consider the deposition testimony in connection with the Motions for Summary Judgment, the Court has done so.  To the extent Plaintiffs suggest the Declarations should not be considered or given less weight because identical declarations were filed in another case, they cited no authority supporting that argument.

Plaintiffs object to the Declaration of Defendant Jannine Hébert due to "key inconsistencies discovered during" her deposition and because she is not an expert in IT or software.  (Dkt. 280 at 10-12, 14-15.)  Defendant Hébert did not hold herself out as an expert in IT or software; her statements were based on her experience as the Executive Clinical Director of MSOP since 2008 and her over 20 years' experience in the field of

sexual violence.  (*See* Dkt. 255 ¶¶ 1-3.)  Plaintiffs have not identified any statement given by Defendant Hébert as outside of the scope of her personal knowledge.  Further, as to the alleged inconsistencies between her Declaration and deposition testimony, the Court finds no inconsistency that would justify exclusion of her Declaration.  Plaintiffs can— and have—identified what they perceive as the inconsistencies and made their arguments accordingly.  (*See e.g.*, Dkt. 280 at 10-11, 13-14.)

As to Defendant Nancy Johnston, similarly, her Declaration is based on her experience as the Executive Director of MSOP and her positions held at DHS since 2003. (Dkt. 254 ¶¶ 1-3.)  She does not offer any opinions on IT or software, although she does offer opinions as to the effect of Mr. O'Leary's proposal on MSOP administration and resources.  Again, Plaintiffs do not identify which of Defendant Johnston's statements exceeds her personal knowledge.

Turning to Dan Storkamp, Plaintiffs argue he does not work for MNIT and has no first-hand knowledge of whether MNIT's resources would be strained by implementation of the "modern technology" proposed by Mr. O'Leary.  (Dkt. 280 at 12.)  Mr. Storkamp attested that he is employed as the Operation Services Director at Minnesota Direct Care and Treatment in DHS; that before joining DHS in 2008, he held various positions, including Operation Service Manager at MSOP, Deputy Director at MSOP, Administrative Director at MSOP, and IT Director at MSOP; that he worked for the Minnesota Department of Corrections in various roles including as the Director of Information and Technology; and that he had personal knowledge of the facts in his declaration.  (Dkt. 256 ¶¶ 1-2.)  Plaintiffs have not presented anything to this Court to

27

show that Mr. Storkamp's employment with MNIT is a predicate for his testimony to be admissible.  Moreover, Mr. Storkamp attested in his Declaration that in his "role as the Operation Services Director at Direct Care and Treatment," he has "personal knowledge of MSOP's Client Computer Network Policy" and that he worked with MNIT "to create MSOP's Client Computer Network."  (*Id.* ¶ 4.)

With respect to Chris Luhman, Plaintiffs argue he testified that "declarations are made up of questions and answers opposing counsel came up with."  (Dkt. 280 at 12 (citing Dkt. 262-7, Ex. D at 121:4-13).)  Mr. Luhman testified in response to a question about where a statement in his Declaration came from: "We wrote the statement together. They asked me a question and that was the answer to the question."  (Dkt. 262-7, Ex. D at 121:10-13.)  The Court sees no basis for exclusion in Mr. Luhman's testimony.  Plaintiffs also have not identified any statement made by Mr. Luhman, who had been employed by MNIT since 2011 in various information securing roles and was the Information Security Director at MNIT when he signed his Declaration (Dkt. 257 ¶¶ 1, 4), for which he lacked personal knowledge.

Finally, Plaintiffs object to the Declaration of John Israel as "untested" because he was not deposed.  (Dkt. 287 at 5.)  While Plaintiffs argue that the Declaration is "suspect," they do not explain what is suspect about the Declaration other than the fact that Mr. Israel was not deposed.  There is nothing improper about "simply [] using declarations instead of depositions."  *Gilmore*, 2015 WL 1189832, at *5 (citing Fed. R. Civ. P. 56(c)).  The Court will not exclude the Declaration on this basis, nor does the

28

Court believe an evidentiary hearing is necessary to test its veracity.  (*See* Dkt. 287 at 5 (requesting evidentiary hearing).)

In sum, Plaintiffs have not shown that any of these declarants lacked the requisite "first-hand knowledge" of the matters the declarants averred to or that the declarants were otherwise incompetent to make the statements in their Declarations.  *See Gilmore*, 2015 WL 1189832, at *5 (finding declarants had "first-hand knowledge" of the matters they averred to, including a Minneapolis Police Chief regarding the Minneapolis police force and its practices, and were "competent to testify to the matters stated"), *order modified in other respects*, 2015 WL 3645846 (D. Minn. June 10, 2015).  The Court rejects Plaintiffs' challenges to the Declarations submitted by Defendants.

Having addressed the evidentiary challenges, the Court turns to the merits of the parties' Motions.

### c.      Plaintiffs' Right to Access the Internet/Information

Plaintiffs and Defendants both contend they are entitled to summary judgment on the right to access the internet/information claim.  (Dkt. 251 at 27-34; Dkt. 260 at 38.)  As discussed above, Judge Brasel has already found the modified *Turner* test applies to this claim.  (Dkt. 76 at 6.)  Indeed, another decision from this District recently observed "[c]ourts in this District have applied a modified version of the test announced by the Supreme Court in *Turner*, when considering constitutional claims of a civilly committed person."  *Ivey*, 2021 WL 120746 at *1 (citing *Karsjens*, 336 F. Supp. 3d at 992).

Courts apply the following four-factor test in determining whether policies are reasonably related to a valid penological interest: (1) "whether the challenged policies are

rationally related to the MSOP's institutional or therapeutic interests"; (2) "whether Plaintiffs have alternative avenues of exercising their rights"; (3) "the effect granting Plaintiffs' requested relief would have on the 'MSOP, its resources, staff, and other clients"; and (4) "whether simple and cost-effective alternatives exist that meet the program's objectives." *Daywitt*, 2021 WL 2210521, at *3 (citing *Ivey*, 2021 WL 120746, at *1; *Banks*, 2017 WL 1901408, at *7-8). Plaintiffs bear the burden of proving that the modified *Turner* factors weigh in their favor. *Banks*, 2017 WL 1901408, at *7. MSOP clients are civilly committed and have "'considerably less [liberty interests] than those held by members of free society' but are 'entitled to more considerate treatment and conditions of confinement' than prisoners." *Id.* (quoting *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006)).

To a great extent, Plaintiffs' arguments have been rejected by two recent decisions in this District which have upheld MSOP's internet and email policies as constitutional. *E.g.*, *Ivey*, 2021 WL 120746 at *3 ("Plaintiff fails to demonstrate that there is any genuine material fact in dispute as to the constitutionality of MSOP's internet policies under the *Turner* standard."); *Banks*, 2016 WL 3566207, at *10 ("MSOP's limitations on detainees' use of computers, email, and internet, to the extent they implicate constitutional concerns at all, pass this [modified *Turner*] test."). In *Ivey*, the plaintiff, an MSOP client, asserted that "MSOP's internet policies violate his First Amendment rights because he could not interact with others via social media, contact political candidates and elected officials, and access other political and news information online." 2021 WL 120746 at *1 (cleaned up). The *Ivey* court found that the plaintiff failed to satisfy the

modified *Turner* test because: he did not demonstrate that "MSOP's ban on internet use is not rationally related to legitimate and institution therapeutic interests, as *Turner* requires"; did not contest that he had alternative means of accessing information found on the internet and provided no authority that convenient access to information found on the internet is the relevant standard; and failed to demonstrate that limited internet access would satisfy the third and fourth *Turner* factors. *Id.* at *2-3. Similarly, in *Banks*, the plaintiff argued that MSOP's policies unconstitutionally limited his access to the internet and email and prevented him from possessing a personal computer of his choice and videogame systems. 2016 WL 3566207, at *9. The *Banks* court found that "MSOP's limitations on detainees' use of computers, email, and the internet do not raise constitutional concerns" and that in any event, the *Turner* factors "weigh[ed] heavily in favor of MSOP's restrictions on computer and internet use." *Id.* at *10 (collecting cases).

Further, there is a major barrier to Plaintiffs' access to internet/information claim: "MSOP's limitations on detainees' use of computers, email, and the internet do not raise constitutional concerns." *Banks*, 2016 WL 3566207, at *10 (collecting cases). As explained in *Banks*:

> The problem with [Banks'] claim that he was unconstitutionally denied computer privileges—both the privilege to possess a personal computer of his choice and to access the internet and e-mail—is that [Banks] has no identifiable constitutional right to possess or use a computer or have an email account or internet access. Although it would likely be more convenient for [Banks] to communicate with others through electronic rather than conventional mail, there is nothing to indicate that the content of his speech was in any way limited by these computer policies, so First Amendment speech concerns are not triggered. The same is true with respect to internet access.

*Id.*  The absence of a constitutional right alone is sufficient reason to grant Defendants'
Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment on
the access to internet/information claim.

Even if the Court assumed for purposes of argument that the Policies did implicate
a First Amendment right, it would still recommend dismissal of this claim because
Plaintiffs have not met their burden to show that the modified *Turner* test weighs in their
favor.

As to the first *Turner* factor, "[t]he rehabilitation of sex offenders and institutional
security of MSOP are legitimate government interests under *Turner*."  *Stone v. Jesson*,
Case No. 11-cv-0951 (WMW/HB), 2019 WL 7546630, at *5 (D. Minn. Dec. 3, 2019)
(cleaned up); *see also Ivey*, 2021 WL 120746, at *2 (same).  Plaintiffs do not contend that
the State of Minnesota does not have a legitimate government interest in rehabilitating
sex offenders and the institutional security of MSOP.

As to the relationship between those interests and the Policies, Defendant Hébert
averred that MSOP's clients' internet restriction is reasonably related to legitimate
institutional and therapeutic interests and that MSOP restricts access to the internet to
ensure "public safety and to maintain the therapeutic environment that is conducive to
change and safe administration at MSOP."  (Dkt. 255 ¶¶ 4, 6.)  She further averred:

> Individuals committed to MSOP often have anti-social tendencies and all
> have engaged in harmful sexual conduct. Based on my experience, it is likely
> that if given access to the internet, some MSOP clients would use the internet
> to: (1) engage in sexual communication with minors and other vulnerable
> people, (2) contact their victims or family members, (3) plot escapes,
> (4) stalk, abuse, and harass individuals outside the secure facility, (5) view,
> read, or listen to counter-therapeutic stimuli including, but not limited to,

32

sexually explicit or violent content, and (6) coordinate and direct criminal activity outside the secure facility, such as assaultive behavior, extortion, or prostitution.

(*Id.* ¶ 4.)

Defendant Johnston, the Executive Director of MSOP, averred that "MSOP has an obligation to monitor client contact with those outside of the secure facility in order to ensure public safety and maintain a therapeutic environment, and does so in a number of ways[,]" including through its policies, and that "MSOP also restricts client access to the internet for administrative reasons, because allowing clients to have internet access would severely impact the balance of institutional resources at MSOP as a whole." (Dkt. 254 ¶¶ 20-23, 25, 27.) Defendant Johnston further states:

> Additionally, MSOP could not provide real-time monitoring while protecting the public safety, ensuring the security of the MSOP facility, or preventing clients from accessing materials that MSOP prohibits such as contraband and counter-therapeutic materials. MSOP staff could only stop MSOP clients from using the internet after they have viewed prohibited content, not prevent them from seeing the content at all, and that after the fact review would also require significant staff resources. Although I do not know the exact cost of real-time monitoring or review of client internet use after the fact, MSOP would not have the resources to provide either because it would require that MSOP hire additional staff and pay the staff to monitor MSOP clients at all times while they access the internet or to review all of their activity after the fact.

(*Id.* ¶ 28.)

Plaintiffs argue that "Defendants' [sic] have not assessed the Plaintiffs' [sic] to make a rational determination whether they can safely use *modern technology* [the turnkey software identified by Mr. O'Leary] or not" and assert that MSOP never conducted any study or research that led to the Policies. (Dkt. 280 at 35.) Whether

Plaintiffs individually can safely use the turnkey software is not the relevant question. The modified *Turner* test considers institutional interests as a whole and does not require consideration of the individual dangerousness posed by each Plaintiff.[16]  *See Daywitt*, 2021 WL 2210521, at *3 (describing modified *Turner* test factors including "whether the challenged policies are rationally related to the MSOP's institutional and therapeutic interests" as well as the effects granting Plaintiffs' requested relief would have on the "'MSOP, its resources, staff, and other clients").  Plaintiffs cite no authority for the proposition that the modified *Turner* test is to be applied on an individual basis, and the Court rejects this argument.

In sum, the Court concludes that no reasonable juror could find that the challenged policies are not rationally related to the MSOP's institutional or therapeutic interests. This factor weighs in favor of Defendants.

As to the second factor, Plaintiffs argue that they "do not have ample First Amendment alternatives to receive information."  (Dkt. 315 at 2.)  But they admit they have access to the U.S. Mail and a telephone.  (*Id.* at 6.)  They can also receive email, and

---

[16]     To the extent Plaintiffs seek to litigate their designation as sexually dangerous persons, they may not do so in this § 1983 action.  *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus . . . requests for relief turning on circumstances of confinement may be presented in a § 1983 action.") (citation omitted); *see also Kearney v. U.S. Marines Presidents*, Case No. 21-CV-1789 (PJS/ECW), 2021 WL 4255401, at *1 (D. Minn. Aug. 17, 2021) ("There are two primary methods for a prisoner to seek relief in federal court: an action concerning the legality or duration of a sentence or conviction is a habeas action (28 U.S.C. §§ 2241, 2254, 2255), or an action concerning the actual conditions of confinement is a civil rights suit, under the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983."), *R. & R. adopted*, 2021 WL 4250153, at *1 (D. Minn. Sept. 17, 2021).

apparently Daywitt has a Netflix account.  (*Id.* at 7-8.)  Further, Defendants identify other ways for Plaintiffs to receive information and communicate with other people, including video visits and in-person visits, if therapeutically appropriate; streaming services; purchasing from approved vendors; calling friends and family; access to CDs, DVDs, books, newspapers, and magazines not prohibited by MSOP policy; watching television and listening to the radio; and access to computers containing legal research materials and word processing software.  (Dkt. 251 at 14-23 (citing numerous deposition transcripts and declarations); *see also* Dkt. 252-1, Hatton Dep. at 69:4-8, 80:9-81:22, 121:6-11 (Plaintiff Hatton testifying that he can contact vendors through "mail or telephone" and could have in-person and video visits); *id.*, Hogy Dep. at 50:7-52:12, 64:10-65:5 - (Plaintiff Hogy testifying that he can make telephone calls, makes about 5 to 6 calls per week, and that MSOP permits clients to have in-person visits); *id.*, Lonergan Dep. at 81:8-83:23 (Plaintiff Lonergan testifying that outbound telephone calls are permitted at MSOP and that he retrieves information about political candidates from others); *id.*, Whipple Dep. at 29:18-30:18 (Plaintiff Whipple testifying that he had received  "ten-plus" in-person visits with family members and had sent mail to family members).) Plaintiffs have not disputed that these alternatives are available; instead they argue that they are less convenient than being able to access the internet and send email.  (Dkt. 315 at 6-7.)  They also identify certain publications that they cannot access.  (*Id.* at 11.)  But "Plaintiffs have not pointed to, and the Court cannot find, any cases suggesting a First Amendment right to access specific publications."  *Daywitt*, 2021 WL 2210521, at *6. Based on the record, the Court concludes that no reasonable juror could find that

Plaintiffs cannot access the information they seek through other means.  "Because Plaintiffs may receive the information they seek via offline means, the second modified *Turner* factor favors the MSOP."   *Daywitt*, 2021 WL 2210521 at *6 (citing *Ivey*, 2021 WL 120746, at *2 (concluding that an MSOP client had alternative means to access information about politics) (denying motion for temporary restraining order); *see also Banks*, 2016 WL 3566207, at *10 ("Moreover, despite MSOP's restrictions on his computer and internet use, Banks is able to exercise his First Amendment rights through other mediums (e.g., letters, phone calls, etc.)").

This brings the Court to the third and fourth modified *Turner* factors, the effect granting Plaintiffs' requested relief would have on the MSOP, its resources, staff, and other clients and whether simple and cost-effective alternatives exist that meet the program's objectives.  Basically, Plaintiffs seek the implementation of "modern technology," that is, the turnkey software identified by Mr. O'Leary.  (Dkt. 280 at 38; Dkt. 315 at 10.)  They generally argue that implementing that software would not impose a great burden on MSOP and they would be willing to bear the costs of doing so.  (Dkt. 315 at 10.)

For the reasons explained in Section III.A.2, the Court recommends excluding Mr. O'Leary's opinions in their entirety.  As such, Plaintiffs' arguments are unsupported by expert testimony and should be rejected.  *See Ivey*, 2021 WL 120746, at *3 ("Further, Plaintiff suggests that MSOP staff members could monitor clients' internet use in real time, yet presents no evidence or expert testimony that such supervision would not unreasonably burden MSOP.") (citing Fed. R. Civ. P. 56(c)(1)(A)).

But even if the Court considers Mr. O'Leary's opinions, Plaintiffs would still fail to meet their burden as to these factors because Mr. O'Leary did not offer any opinion as to what it would cost to implement the WebTitan, SpamTitan, ArcTitan, and MobiConnect software; monitor clients' internet usage on an ongoing basis; update the "blocked" and "unblocked" websites, email recipients, etc. on an ongoing basis; and otherwise ensure that the legitimate government interests currently served by the Policies would be served if the turnkey software were used.  There is no evidence as to what it would cost to install and implement Mr. O'Leary's turnkey software solution.  Notably, while Mr. O'Leary made some generalized statements about costs, he also repeatedly testified that he was "just guessing" as to certain costs.  (Dkt. 245-1, Ex. 2 at 153:4-154:17; *see also id* at 150:4-14 (also guessing as to mailroom costs).)  Mr. O'Leary himself defines guessing as "speculative" (Dkt. 245-1, Ex. 1 at 113), says "[g]uessing is not science-based and thus is not a professional opinion (*id.* at 147), and says guessing is not a "science-based answer" (*id.* at 149).  He also testified that he did not make a specific calculation as to implementation costs because "I didn't want to make a statement in a report that would then be refuted later.  You know what I mean?  If I'm making statement in a report, I'm very confident I can stand behind that."  (Dkt. 245-1, Ex. 2 at 153:4-12.)  No reasonable juror could credit Mr. O'Leary's generalized guesses about implementation cost.  Consequently, Plaintiffs have not presented evidence of a "simple and cost-effective alternative[]"—much less one that could "meet the program's objectives."

Moreover, there is extensive evidence that allowing MSOP clients access to the internet and email, even using Mr. O'Leary's turnkey software solutions, would not serve the legitimate interests served by the current Policies because, as Defendant Hébert explained, "MSOP would have a responsibility to ensure clients utilize those allowed categories of websites in a way that is consistent with public safety rather than assuming that all use of the internet in these broad categories presents no risk." (Dkt. 255 ¶ 8.) Defendant Johnston explained that "real-time monitoring" would be needed to protect the public safety, ensure the security of the MSOP facility, and prevent clients from accessing materials that MSOP prohibits such as contraband and counter-therapeutic. (Dkt. 254 ¶ 28.)

Mr. Storkamp, the Operation Service Manager at Minnesota Direct Care and Treatment in DHS, attests that "MNIT does not have the resources or technology to monitor the activities of MSOP clients on the client network in real time"; "MNIT's [current] work inspecting and monitoring the client network is conducted after the fact, meaning that the potentially unauthorized activities, files, or breaches occur before MNIT can monitor and inspect them"; and that "[i]f MSOP clients were given access to the internet similar to staff, MNIT would be required to take significant steps and greatly increase staff to prevent potentially unauthorized activities, files access, or breaches from occurring." (Dkt. 256 ¶¶ 6, 9, 12.) According to Mr. Storkamp, "[t]hese additional steps and resources would not totally eliminate the potential unauthorized activities, file access, or breaches from occurring." (*Id.* ¶ 12.) Further, Mr. Luhman, the Information Security Director at MNIT, stated: "[b]ased on my experience and professional judgment, MNIT

could not extend the current employee internet access to MSOP clients while also protecting public safety, ensuring the security of the MSOP facility, or preventing MSOP clients from accessing materials that MSOP does not allow" and that "there are rare occasions when sites which should be categorically blocked are not in fact blocked." (Dkt. 257 ¶¶ 11, 13.)  Mr. Luhman further stated that "if MSOP clients were provided with the same access as employees, there could be situations where MSOP clients could access materials related to sexuality, pornography, hate/discrimination, and illegal activities because they were not properly blocked by MNIT's vendor" and that he is "not aware of any technology that MNIT could purchase that would allow MNIT to both provide persons with access to social media websites and personal electronic mail accounts" "while allowing MNIT to monitor or control a person's activities or communications on those social medica websites or personal electronic mail accounts." (*Id* ¶¶ 13, 15.)

Mr. O'Leary, however, asserts that real-time monitoring is not necessary.  (Dkt. 245-1, Ex. 1 at 96 ("**Today, in 2022, with modern technology, you do not need to have a human sitting at a computer screen watching all the MSOP client activity!**").) Instead, according to Mr. O'Leary:

> If I were to install and configure WebTitan, I would enable the features that will notify the MSOP clinical staff when a content violation takes place by an MSOP client. In addition, the software would automatically electronically log the policy violation and have it available for the client's next counseling session with an MSOP clinical staff member. MSOP stated in their depositions that every MSOP client is unique; thus, this individual client behavioral data is invaluable for a person's therapeutic progress.

39

(*Id.* at 97.)  In other words, he relies on after-the-fact monitoring.[17]  This ignores the harm to the public and the MSOP client's treatment occurring at the same time as the "content violation."

One court has already rejected an MSOP client's assertion "that MSOP can purchase technology that would allow MSOP clients to access certain websites while blocking access to other websites" because "MSOP, however, cannot purchase the technology that Plaintiff describes because no technology exists that would allow MSOP to monitor client communications in real time."  *Ivey*, 2021 WL 120746, at *2 (citations omitted).  Nothing in Mr. O'Leary's opinions changes that conclusion that no technology exists that would allow MSOP to monitor client communications in real time.  For this reason, and because no reasonable juror could find Plaintiffs have met their burden as to cost to implement the turnkey software identified by Mr. O'Leary (with or without real-time monitoring), the Court finds the third and fourth *Turner* factors weigh in Defendants' favor.

For all of these reasons, the Court recommends that Defendants' Motion for Summary Judgment be granted and Plaintiffs' Motion for Summary Judgment be denied as to Plaintiffs' access to the internet/information claim.

---

[17]     Mr. O'Leary provides no estimate as to the cost of after-the-fact monitoring.

2.     **Free Exercise**

Regarding their free exercise claim, Plaintiffs allege in the First Amended

Complaint that a lack of internet access prevents Plaintiffs with religious beliefs from

fully engaging in religious activities.  (Dkt. 26-1 ¶¶ 53, 70, 86.)

To state a free exercise claim, Plaintiffs must establish that MSOP's policies place

a substantial burden on their religious practice.  *See Patel v. U.S. Bureau of Prisons*, 515

F.3d 807, 813 (8th Cir. 2008).  The Eighth Circuit has explained that to be considered a

"substantial burden,"

> the governmental action must significantly inhibit or constrain conduct or
> expression that manifests some central tenet of a [person's] individual
> [religious] beliefs; must meaningfully curtail a [person's] ability to express
> adherence to his or her faith; or must deny a [person] reasonable
> opportunities to engage in those activities that are fundamental to a [person's]
> religion.

*Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997) (citations omitted).

Plaintiffs bear the burden of establishing that MSOP has placed a substantial

burden on their ability to practice their religious beliefs.  *Gladson v. Iowa Dep't of Corr.*,

551 F.3d 825, 833 (8th Cir. 2009).  "Once a person demonstrates that their sincerely held

religious beliefs have been substantially burdened, and does so in the context of civil

commitment, courts in this district have historically applied a modified version of the

[*Turner*] multi-factor test."  *Daywitt v. Moser*, No. 17-cv-1720 (WMW/LIB), 2019 WL

5104804, at *8 (D. Minn. June 5, 2019).  "In doing so, the court considers a Plaintiff's

First Amendment claims in light of appropriate therapeutic interests as well as relevant

safety and security concerns."  *Daywitt*, 2019 WL 5104804, at *8 (cleaned up).

Plaintiffs identify the following facts as evidence that the Policies burden their religious practice: a monthly magazine on Judaism has gone to an online only format, a church has moved to "an online format almost entirely," one plaintiff cannot participate in an online bible study group, one plaintiff has to pay for certain ministry materials (but they would be free online), one plaintiff cannot enroll in a particular online bible college, and one plaintiff "could practice Orthodox Judaism more effectively if he had personal access to the internet."  (Dkt. 260 at 18-20; *see also* Dkt. 280 at 39-42.)  Plaintiffs did not identify any aspect of their religions that requires them to do any of the activities prohibited by the Policies.

Moreover, the record is clear that Plaintiffs participate in religious activities on a regular basis.  Defendants assert in their brief (and Plaintiffs do not dispute) that: Plaintiff Daywitt testified that he participated with others in daily congregate prayer and in weekly Kiddush and Havdalah services at the MSOP facility in Moose Lake, Minnesota.  (Dkt. 252-1, Daywitt Dep. at 16:21-17:22.)  Plaintiff Hatton testified that he participates in a spiritual group at the MSOP and that he is provided a spiritual room as well as a sweat lodge area to practice Anishinabe traditions.  (*Id.*, Hatton Dep. at 37:9-38:16, 120:4-17.)  As to Plaintiff Whipple, he has practiced his spirituality in "the Native Talking Circle, Native sweat lodge" and powwows.  (*Id.*, Whipple Dep. at 8:11-15, 11:15-12:15, 108:23-109:6, 113:4-13.)  He has also purchased a CD containing spiritual songs and communicated with a medicine man.  (*Id.* at 111:9-12, 113:16-114:2.)  During his time at the MSOP, Plaintiff Lonergan has studied daily with another client who shares his faith; has received print materials from, and had phone calls with, his preferred ministry;

ministers to incarcerated individuals "through the mail"; and can access to DVDs or CDs relating to his faith.  (*Id.*, Lonergan Dep. at 49:6-52:11, 54:7-17, 56:14-20; 83:18-25; 86:3-19.)  He also belongs to a ministry located outside the MSOP.  (*Id.* at 49:4-5.)

Further, MSOP clients are generally permitted to possess faith-based media.  (*See id.*, Daywitt Dep. at 40:1-6; 68:22-24 (Plaintiff Daywitt testifying that he reads the Torah and other religious texts, and receives a Jewish magazine called "Moment" at the MSOP); *see also id.*, Hogy Dep. at 86:5-9 (Plaintiff Hogy testifying that he does not need special permission to possess or read religious materials); *id.*, Hatton Dep. at 35:6-19 (Plaintiff Hatton testifying that he has access to DVDs through which he  learns about Native American traditional and spiritual teachings).)  MSOP clients can also use the U.S. Mail and telephone for religious communications and to receive faith-based media. (*See id.*, Hatton Dep. at 120:18-121:11 (Plaintiff Hatton testifying that he is able to call, mail and have in person visits with spiritual leaders); *see also id.*, Daywitt Dep. at 15:21-25, 16:7-11 (Plaintiff Daywitt testifying that a rabbi visited the MSOP facility in Moose Lake, Minnesota three times per month and acknowledging that a rabbi could visit him at the MSOP facility in St. Peter, Minnesota); *id.*, Hogy Dep. at 56:18-59:9, 66:2-7, 85:1-4 (Plaintiff Hogy testifying that he receives church newsletters monthly and devotionals by mail and speaks to other parishioners and his pastor by phone).)  MSOP clients can also view approved internet streaming programming as part of their designated spiritual practice.  (*See* Dkt. 254-1, Defs.' Ex. 9 (MSOP's Computer Internet Streaming policy); *see also* Dkt. 252-1, Daywitt Dep. at 15:6-12 (Plaintiff Daywitt testifying that he streams religious programming at the MSOP monthly and during Yontif).)

43

While Plaintiffs would prefer to use the internet to engage in their religious observances, "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004); *see also Biron v. Hurwitz*, Case No. 19-cv-57 (SRN/LIB), 2019 WL 13334558, at *12 (D. Minn. Nov. 22, 2019) (granting motion to dismiss free exercise claim because  [b]ased on the allegations in her Second Amended Complaint, Plaintiff remains free to communicate via United States mail or telephone with the persons discussed in her Second Amended Complaint" and "Plaintiff's mere desire to communicate with people through email, as opposed to through conventional mail sent through the United States Postal Service or via telephone, fails to demonstrate a substantial burden on her ability to practice her religious beliefs") (citation omitted).

In any event, even if the Court were to find that Plaintiffs have sufficiently shown that their religious beliefs have been substantially burdened, because the essence of Plaintiffs' free exercise claim relates to using the internet in practicing their religions, no reasonable juror could find that the modified *Turner* factors weigh in favor of Plaintiffs on this claim for the same reasons stated with respect to the access to internet/information claim in Section III.B.1.c.  The Court therefore recommends that Defendants' Motion for Summary Judgment be granted, and Plaintiffs' Motion for Summary Judgment be denied, as to Plaintiffs' free exercise claim.

* * *

44

In sum, the Court recommends that Defendants' Motion to Exclude be granted; Plaintiffs' Motion for Summary Judgment be denied; Defendants' Motion for Summary Judgment be granted; and the remaining claims in this lawsuit be dismissed.

## C.      Motion for ITV Communication

On December 2, 2022, Plaintiffs filed the Motion for ITV Communication asking that the Court amend its "May 2, 2022 Order to allow" Plaintiffs "to have weekly ITV meetings to allow for them to effectively litigate and prepare for trial" in view of the December 1, 2022 trial-ready date. (Dkt. 285 at 1; Dkt. 308.) Defendants opposed the Motion. (*See* Dkt. 293.) Defendants argued that there is no date certain for trial because the Court had not ruled on the Motions for Summary Judgment and that Plaintiffs had been able to effectively litigate through summary judgment using the U.S. Mail and telephone. (*See id.* at 1-2.) In response, Plaintiffs argued that they needed weekly ITV meetings to respond to the Motions for Summary Judgment, particularly because Plaintiff Daywitt was in a different location from the other Plaintiffs. (Dkt. 308).

However, the Court permitted Plaintiff Daywitt to file his own briefs in connection with summary judgment, which he did. (*See* Dkts. 313-315.) This remedies any alleged harm resulting from having monthly, rather than weekly, ITV meetings. And to the extent Plaintiffs request weekly ITV meetings to prepare for trial, the need for those meetings is moot insofar as the Court is recommending dismissal of this lawsuit and not ripe insofar as there is no date certain for trial such that Plaintiffs would need to prepare. For all of these reasons, the Court denies the Motion for ITV Communication.

## IV.    ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.    Plaintiffs' Motion to Allow Weekly ITV Communication Between Plaintiffs (Dkt. 285) is **DENIED**.

## V.    RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1. Defendants' Motion to Exclude the Plaintiffs' Expert (Dkt. 241) be **GRANTED**;

2. Plaintiffs' Motion for Summary Judgment (Dkt. 248) be **DENIED**;

3. Defendants' Motion for Summary Judgment (Dkt. 249) be **GRANTED**; and

4. This action be **DISMISSED WITH PREJUDICE.**

Dated: July 28, 2023                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge


## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).