UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| KENNETH DAYWITT, et al., | Case No. 20-CV-1743 (NEB/ECW) |
| Plaintiffs, | |
| v. | ORDER ON REPORT & RECOMMENDATION |
| JODI HARPSTEAD,[1] et al., | |
| Defendants. | |

*Pro se* Plaintiffs, civilly committed clients of the Minnesota Sex Offender Program, brought this lawsuit alleging that MSOP's restrictions on clients' internet use violate Plaintiffs' First Amendment rights. Plaintiffs retained an expert to support their claims. Defendants move to exclude Plaintiffs' expert, and both parties move for summary judgment. In a Report and Recommendation, United States Magistrate Judge Elizabeth Cowan Wright recommends excluding Plaintiffs' expert, denying Plaintiffs' Motion for Summary Judgment, and granting Defendants' Motion for Summary Judgment. (ECF No. 326 ("R&R").) Because Plaintiffs object to the R&R, (ECF No. ("Obj.") 338), the Court

---

[1] Harpstead is the Commissioner of the Minnesota Department of Human Services. Plaintiffs' complaints, motions, and briefs misspell the Commissioner's name. The Court will use the correct spelling.

reviews it *de novo*.[2] 28 U.S.C § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). After a *de novo* review, the Court overrules the objection and accepts the R&R.

## BACKGROUND

The R&R and this Court's previous order explain the facts and procedural posture of this case and those are incorporated here. (R&R at 2–7; ECF No. 76 (June 1, 2021 order).) The Court repeats only those facts necessary for context.

This lawsuit concerns First Amendment challenges to three MSOP policies that restrict Plaintiffs' ability to use technologies. (ECF No. 26-1 ("Am. Compl.") ¶ 4.) First, clients may receive electronic messages through MSOP's C-Mail program, but clients may not send outgoing emails. (ECF No. 38-1 at 2–3.) Second, MSOP does not allow clients to access the internet, instead allowing clients to use computers for "approved purposes," such as completing treatment assignments, word processing, and conducting legal research. (ECF No. 38-1 at 6; *see* ECF 255 ("Hébert Decl.") ¶ 4.) Third, MSOP allows clients to use videoconference software to visit with family, friends, and support personnel, but only to visit with someone on their deathbed or to conduct a "clinically

---

[2] Defendants argue that the Court should apply a clear error standard when Plaintiffs fail to make specific objections. (ECF No. 339 at 2, 7–8.) Although courts in this District have applied the clear error standard of review for non-specific objections, the Eighth Circuit has emphasized the necessity for *de novo* review when a party makes any objection. *See United States v. Chapman*, No. 18-CR-250 (ECT/SER), 2019 WL 1487847, at *1–2 (D. Minn. Apr. 4, 2019) (collecting cases and discussing Eighth Circuit precedent); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995).

2

supported visit." (ECF No. 38-1 at 14–16.) Plaintiffs claim these policies violate their First Amendment right to access the internet and exercise their religion. (Am. Compl. *passim*.)

## ANALYSIS

### I. Motion to Exclude Patrick O'Leary as an Expert

Plaintiffs object to the R&R's recommendation to exclude their expert Patrick O'Leary, so the Court reviews this recommendation *de novo*. The R&R was thorough, and after a *de novo* review, the Court concludes that Judge Wright's analysis and conclusions are correct. Plaintiffs' objection to the exclusion of O'Leary is overruled.

### II. Motions for Summary Judgment on First Amendment Claims

Plaintiffs assert that MSOP policies violate their First Amendment right to access the internet and their First Amendment right to free exercise of religion. For these claims, a threshold issue is what standard applies to constitutional claims of MSOP clients. Judge Wright applied the *Turner* factors, modified for civil commitment clients, and found no violation of constitutional rights.

Plaintiffs object on several fronts, asserting that a modified analysis is not the proper standard to evaluate the claims, and that even if it is, Judge Wright misapplied the standard.[3]

---

[3] Plaintiffs also argue that the R&R did not cite all of their evidence. But "[t]he Court is not required to address every piece of evidence and/or testimony in its opinion [on a motion for a summary judgment], and the fact that each item on Plaintiff's list was not specifically addressed . . . does not mean that it was not appropriately considered." *Zuno v. Wal-Mart Stores, Inc.*, No. CIV.A. 06-2392, 2009 WL 3837198, at *3 (E.D. Pa. Nov. 6, 2009);

3

## A.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party. *Engelhardt v. Qwest Corp.*, 918 F.3d 974, 979 (8th Cir. 2019). "Nevertheless, a plaintiff seeking to defeat summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with *specific facts* showing that there is a genuine issue for trial." *Id.* (quotation marks and citation omitted).

Courts liberally construe *pro se* pleadings and hold them to a less stringent standard than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). But a *pro se* plaintiff's claims cannot survive summary judgment unless she has set forth specific facts showing that there is a genuine issue for trial. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

---

*see Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, No. 04 C 3341, 2005 WL 1838428, at *3 (N.D. Ill. July 29, 2005) ("[T]he court is not required to make specific reference to every piece of evidence it reviews . . . .").

4

B.     *The Modified* **Turner** *Factors Apply*

Plaintiffs object to Judge Wright's application of the modified *Turner* factors to their constitutional claims.[4] The question is whether a standard modeled after *Turner v. Safley*—a case about the constitutional rights of prisoners—should apply here—a case about the constitutional rights of civil commitment clients. This Court, like others in this District,[5] determines that the answer to that question is yes.

In *Turner*, the Supreme Court found that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). Several factors are relevant in determining the reasonableness of the regulation:

> (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising their rights remain open to the prisoners; (3) whether accommodation of the asserted rights will trigger a "ripple

---

[4] Defendants assert that the Court must apply the modified *Turner* factors here because the Court applied the test at the motion-to-dismiss stage, and the Court is bound by the law of the case. (ECF No. 339 at 5.) The law-of-the-case doctrine, however, "applies only to issues decided by final judgments." *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992); *United States v. Hively*, 437 F.3d 752, 766 (8th Cir. 2006) ("The [law-of-case] doctrine does not apply to interlocutory orders, however, for they can always be reconsidered and modified by a district court prior to entry of a final judgment."). The Court's ruling on Defendants' motion to dismiss was not a final judgment, so the doctrine does not apply. *See Wright v. S. Ark. Reg'l Health Ctr., Inc.*, 800 F.2d 199, 202 (8th Cir. 1986) ("[A] denial of summary judgment is not treated as final . . . until the conclusion of a case on the merits."). Regardless, for the reasons discussed below, application of the modified *Turner* standard is proper.

[5] *Ivey v. Johnston*, No. 18-CV-1429 (PAM/DTS), 2021 WL 120746, at *3 (D. Minn. Jan. 13, 2021); *Banks v. Jesson*, No. 11-CV-1706 (SRN/LIB), 2017 WL 1901408, at *7–8 (D. Minn. May 8, 2017).

> effect" on fellow inmates and prison officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoners' rights at de minimis cost to the valid penological interest.

*Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012) (citation omitted) (listing the *Turner* factors). These factors balance the need to protect prisoners' constitutional rights with the need to be deferential to prison administrators. *Turner*, 482 U.S. at 85. This deferential standard is necessary if "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Id.* at 89 (alterations in original) (quoting *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 128 (1977)). As the *Turner* court noted, running a prison is a difficult task better suited for the legislative and executive branches, warranting judicial deference. *Id.* at 85.

*Turner* considered strict scrutiny as an alternative. *Id.* at 89. But applying an inflexible strict scrutiny analysis to day-to-day judgments of prison officials would hamper their ability to anticipate security problems and adopt innovative solutions to them. *Id.* This approach would leave courts as the primary arbiters of the best solution to every administrative problem, which would "unnecessarily . . . perpetuate the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. 396, 407 (1974).

The rationale underlying *Turner*'s judicial restraint applies equally in the civil commitment context. Like prison administrators, MSOP custodians are engaged in "an inordinately difficult undertaking that requires expertise, planning, and the commitment

6

of recourses," *Turner*, 482 U.S. at 85, and they need to be able to perform their duties safely and effectively.[6] *See Serna v. Goodno*, 567 F.3d 944, 953 (8th Cir. 2009) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison. Administrators have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety." (citation omitted)). "Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner." *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004).

In addition, as far as the Court is aware, every circuit to address the constitutional validity of a civil commitment program policy has identified *Turner* as the appropriate standard. *See Ahlers v. Rabinowitz*, 684 F.3d 53, 65–66 (2d Cir. 2012); *Matherly v. Andrews*, 859 F.3d 264, 280–81 (4th Cir. 2017); *Brown v. Phillips*, 801 F.3d 849, 853–54 (7th Cir. 2015); *Herrick v. Strong*, 745 F. App'x 287, 288 (9th Cir. 2018); *Pesci v. Budz*, 730 F.3d 1291, 1298–

---

[6] Judicial restraint and deference to the judgment of institutional officials also remain relevant to civil detention. *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, the Supreme Court evaluated a civil detainee's constitutionally protected liberty interest under the Fourteenth Amendment Due Process Clause by weighing the constitutional rights of the detainee against the relevant state interest. *Id.* at 321. The Court explained that "courts must show deference to the judgment exercised by a qualified professional." *Id.* at 322.

1230 (11th Cir. 2013).[7] The near universal application of *Turner* to civil commitment supports the Court's decision.

So *Turner* applies, but it must be modified, because the universe of "legitimate governmental interests" is narrower for civil commitment than for prisons.[8] The purpose of prisons and civil confinement are different. Commitment "does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." *Kansas v. Hendricks*, 521 U.S. 346, 361–62 (1997). The government cannot justify "restraint on detainees' constitutional rights for reasons related to punitive conditions of confinement." *Pesci*, 730 F.3d at 1298. But the government can justify its program based on a valid, rational connection to legitimate interests in institutional order, safety, security, and rehabilitation and treatment of civil detainees. *Id.* Thus the modified *Turner* factors look at the government's legitimate nonpunitive interests rather than its penological interests.

---

[7] The Eighth Circuit has applied *Turner* in the context of civil commitment, but in that case "both parties agree[d] that the *Turner* test applies." *Beaulieu*, 690 F.3d at 1039 (applying *Turner* without modification).

[8] The narrower universe of legitimate governmental interests for civil confinement reflects that the liberty interests of civilly committed people "are considerably less than those held by members of free society," *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006), but they are entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321–22; *see also Bell v. Wolfish*, 441 U.S. 520, 546 (1979) ("A detainee simply does not possess the full range of freedoms of an unincarcerated individual."); *id.* at 546 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.").

Accordingly, to determine whether the regulation is reasonable, the Court applies the *Turner* factors, modified as follows: (1) whether there is a valid, rational connection between the regulation and legitimate institutional and therapeutic interests put forward to justify it; (2) whether alternative means of exercising Plaintiffs' rights remain open to them; (3) whether accommodation of the asserted rights will trigger a "ripple effect" on MSOP clients and staff; and (4) whether a ready alternative to the regulation would fully accommodate Plaintiffs' rights at *de minimis* cost to the valid institutional and therapeutic interest.[9] *Turner*, 482 U.S. at 90.

C.     *Internet Access*

Application of the modified *Turner* factors to Plaintiffs' claim of a right to access the internet reveals that Judge Wright's analysis was correct.[10]

---

[9] Other courts have similarly modified the *Turner* factors for civil confinement. *E.g.*, *Matherly*, 859 F.3d at 282; *Phillips*, 801 F.3d at 853–54; *Pesci*, 730 F.3d at 1298; *Ivey v. Johnston*, No. 18-CV-1429 (PAM/DTS), 2021 WL 120746, at *3 (D. Minn. Jan. 13, 2021); *Banks v. Jesson*, No. 11-CV-1706 (SRN/LIB), 2017 WL 1901408, at *20–22 (D. Minn. May 8, 2017).

[10] Plaintiffs construe their claim as the right to access the internet. While the Complaint questions the validity of the three specific policies—the C-Mail policy, internet policy, and videoconferencing policy—Plaintiffs' subsequent memoranda focus on their right to access the internet generally. (ECF No. 260 at 17–37; ECF No. 280 at 8–15, 20–39; ECF No. 287 at 11–20; Obj. at 29–38.) Plaintiffs have not developed arguments or evidence to support the unconstitutionality of the C-Mail and videoconferencing policy specifically. Plaintiffs have therefore failed to meet their burden of showing that the C-Mail and videoconference polices are unconstitutional. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")

No binding case law exists about whether Plaintiffs have a right to access the internet. But the First Amendment extends to speech distributed through the internet. *Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 885 (1997); *Packingham v. North Carolina*, 582 U.S. 98, 104–05, 107–08 (2017). The First Amendment includes "the right to receive, the right to read and freedom of inquiry, [and] freedom of thought." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (citation omitted). Assuming a right to access the internet is implicated here, the next step is to apply the modified *Turner* factors.

The first factor is whether there is a valid, rational connection between the regulation and legitimate institutional and therapeutic interests put forward to justify it. *Turner*, 482 U.S. at 89. MSOP bears the burden of proving the rational connection. *Sisney v. Kaemingk*, 15 F.4d 1181, 1190 (8th Cir. 2021). "Unless a rational connection between the regulation and the asserted interest is a matter of common sense, the [institution] must proffer some evidence to support the existence of such a connection." *Id.* at 1191 (quotation marks and citations omitted).

MSOP policies are validly and rationally connected to rehabilitation and institutional security. Restrictions on internet access and monitoring with whom clients communicate "maintain the therapeutic environment conducive to change and safe administration of MSOP." (Hébert Decl. ¶ 4.) MSOP has legitimate concerns that some MSOP clients would use the internet for countertherapeutic purposes, such as sexual communication with vulnerable people and harassing individuals outside the facility. (*Id.*

10

¶ 4.) Indeed, Plaintiffs acknowledge that some clients would use the internet for improper purposes. (ECF No. 252-1 at 246–318 ("Whipple Dep.") at 38:21–41:17 (acknowledging that MSOP policies address a legitimate concern that clients would use the internet to access inappropriate websites), 46:4–47:5 (discussing finding inappropriate photos on an MSOP computer); ECF No. 252-1 at 193–244 ("Lonergan Dep.") at 70:14–15; *see* ECF No. 252-1 at 3–57 ("Daywitt Dep.") at 76:6–80:23.)

Additionally, MSOP has valid institutional concerns. After clients escaped from MSOP, MSOP began monitoring phone calls because those clients had planned the escape over the phone. (ECF No. 254 ("Johnston Decl.") ¶ 21.) MSOP does not have the resources to monitor websites clients view, emails clients send, and video calls clients make. (*Id.* ¶¶ 20–21,25–27.) Accordingly, the first factor falls in Defendants' favor.[11]

The second factor is whether alternative means of exercising Plaintiffs' rights remain open to them. *Turner*, 482 U.S. at 90. The right in question is "viewed sensibly and expansively." *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989). "Alternatives to the type or amount of speech at issue need not be ideal . . . they need only be available." *Simpson v. Cty. of Cape Girardeau*, 879 F.3d 273, 280–81 (8th Cir. 2018) (alteration in original)

---

[11] Plaintiffs argue that Defendants have failed to provide evidence that MSOP's policy achieves the stated goal. But *Turner* does not require "actual proof that a legitimate interest will be furthered by the challenged policy. The connection between the two need only be objectively rational." *Herlein v. Higgins*, 172 F.3d 1089, 1091 (8th Cir. 1999). And here there is a common sense and rational connection between MSOP's policies and the stated interest.

(quotation marks and citation omitted) (asking whether the right has been "completely foreclosed"); *Ortiz v. Fort Dodge Correctional Facility*, 368 F.3d 1024, 1027(8th Cir. 2004) (finding an adequate alternative to writing and receiving letters from family members where family could communicate via phone calls and in-person visits).

Here, a sensible and expansive view of the right in question is the right to access the information found on the internet. Plaintiffs have many alternative means to exercise that right. They can use conventional mail to communicate with friends, families, politicians, and others. (ECF No. 254-1 at 13–22; ECF No. 252-1 at 59–135 ("Hatton Dep.") at 72:15–21.) They can also communicate with people, including friends and family, outside MSOP via telephone (ECF No. 252-1 at 137–191 ("Hogy Dep.") at 64:20–65:5; Lonergan Dep. at 83:2–17) and in-person visits. (ECF No. 254-1 at 105–112; Hatton Dep. at 121:6–11; Whipple Dep. at 29:18–30:3; Hogy Dep. 50:24–51:1) Plaintiffs can read newspapers, watch television, and listen to the radio. (Hogy Dep. at 40:20–24; 45:12–46:10; Daywitt Dep. at 44:14–45:6; Whipple Dep. at 96:8–97:25; Hatton Dep. at 32:23–33:8) Because the exercise of this right has not been "completely foreclosed," the second factor also supports finding that the MSOP policies are constitutional. *Simpson*, 279 F.3d at 280–81.

The third factor is whether accommodation of the asserted rights will trigger a "ripple effect" on MSOP clients and staff. *Turner*, 482 U.S. at 90. Defendants present evidence that MSOP houses over 700 clients, and that MSOP cannot logistically do what

Plaintiffs ask while continuing to meet their obligations to the public. (Hébert Decl. ¶¶ 7–8; ECF No. 256 ¶ 11–12.) "MSOP could not provide real-time monitoring while protecting the public safety, ensuring the security of the MSOP facility, or preventing clients from accessing materials that MSOP prohibits such as contraband and counter-therapeutic materials." (Johnston Decl. ¶ 28.) And monitoring internet access and who clients communicate with is necessary to ensure that a client is not using the internet or communicating with someone for a countertherapeutic purpose. (*Id.* ¶ 29.) So the third factor supports Defendants' position as well.

The fourth factor is whether a ready alternative to the regulation would fully accommodate Plaintiffs' rights at *de minimis* cost to the valid institutional and therapeutic interest. *Turner*, 482 U.S. at 90–91. Plaintiffs suggest that categorical blocking, which MSOP already uses to control employee internet access, would facilitate MSOP's goals while allowing Plaintiffs access to the internet. (ECF No. 257 ¶ 9.) But MSOP would still have to monitor client internet access, which MSOP does not have the resources to do. (*Id.* ¶¶ 11–12, 14–16.) And categorical blocking is not foolproof—sometimes sites that should be blocked are not. (*Id.* ¶ 13.) Plaintiffs have not identified a sufficient alternative, so the fourth factor falls in Defendants' favor. Because all modified *Turner* factors support finding that the policies are constitutional, the MSOP policies do not violate the First Amendment right to information through access to the internet.

D.   *Free Exercise*

Plaintiffs object to the R&R's recommendation to dismiss Plaintiffs' free exercise claim, so the Court must review it *de novo*. Having conducted a *de novo* review of the R&R, the Court concludes that Judge Wright's analysis and conclusions about Plaintiffs' free exercise claim are correct. Plaintiffs bear the burden of establishing that MSOP policies place a substantial burden on their ability to practice their religious beliefs, *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 833 (8th Cir. 2009), and they have not done so.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Objection to the Report and Recommendation (ECF No. 338) is OVERRULED;

2. The Report and Recommendation (ECF No. 326) is ACCEPTED;

3. Defendants' Motion to Exclude Plaintiffs' Expert (ECF No. 241) is GRANTED;

4. Plaintiffs' Motion for Summary Judgment (ECF No. 248) is DENIED;

5. Defendants' Motion for Summary Judgment (ECF No. 249) is GRANTED; and

6. This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 28, 2023 BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge